LESTA RAMEY AND ALKA RAMEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5357–64. Filed January 4, 1967.

*John A. Dunkel,* for the petitioners.
*Conley G. Wilkerson,* for the respondent.

FAY, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years 1960 and 1961 in the amounts of $2,559.47 and $865.84, respectively.

The only issue for decision is whether petitioners are entitled to deductions for percentage depletion on coal mined from a certain tract of land known as the Blood property during the calendar years 1960 and 1961.

### FINDINGS OF FACT

Petitioners Lesta (hereinafter referred to as petitioner or Ramey) and Alka Ramey filed joint Federal income tax returns for the calendar years 1960 and 1961 with the district director of internal revenue, Cincinnati, Ohio. Ramey has been engaged in the business of strip-

mining coal in Jackson County, Ohio, since 1946. His business was normally carried on with a crew of three, consisting of two employees and petitioner. Petitioner's activities have been restricted to the mining, usually by the strip-mining method, of what is known as No. 1 seam coal. Because of some of its characteristics, primarily its low sulfur content and high fusion point, this coal is suitable only for blast furnace use.

The Jackson Iron & Steel Co. (hereinafter referred to as Jisco), a corporation engaged in the manufacture of silvery pig iron and foundry iron, operated blast furnaces in Jackson County, Ohio. During the years in issue Jisco was the only purchaser of No. 1 seam coal in Jackson County, Ohio. Globe Iron Co., located in Jackson, Ohio, which was purchased by Inter-Lake Iron Corp. in 1956, was the only purchaser of No. 1 seam coal other than Jisco during the period from 1949 through 1958.[1] However, Globe Iron Co. had its own supplier of coal and Ramey never had sold any coal to it.

In 1949, petitioner, acting on his own behalf, approached William and Lena Blood, the owners of a tract of land in Jackson County, for the purpose of acquiring rights to the coal underlying their land. This culminated in a lease from the Bloods to petitioner dated February 10, 1949, whereunder the Bloods leased to petitioner all the "stone coal" underlying their tract (at least 196 acres described by metes and bounds in the lease) with the right to enter upon the premises to prospect for coal and to ascertain whether there was coal of sufficient quantity and quality for use in the blast furnaces of Jisco, together with surface rights and all necessary rights-of-way to remove the coal, erect tipples, etc. The initial term of this lease was for 5 years if coal of sufficient quantity and quality could be found, with the privilege in the lessee to renew for an additional term of 10 years. The lessee was to mine the coal by either the drift method or the strip method and was to pay the lessor a royalty of 30 cents per ton on all coal mined and removed by the strip-mining method and 25 cents per ton for all coal mined and removed under the drift-mining method. The lease provided that the lessee should start mining operations on the premises in 1949 and continue the mining operations thereon as the market conditions would permit during the entire term of the lease, and it further provided that the lessee was to pay to the lessor a minimum royalty of $50 per year for each 40 acres, which minimum was to be applied to tonnage royalty over a certain minimum amount.

After petitioner acquired the lease on the Blood property, Jisco and petitioner agreed that petitioner would assign the lease to Jisco, and, if it developed that there was coal underlying the property, Jisco

---

[1] In 1958, Inter-Lake Iron Corp. (formerly Globe Iron Co.) changed its method of operation and discontinued the use of coal for gasoline.

would sublease the coal to petitioner and buy coal from him. Ramey's purpose in assigning the lease to Jisco was to create a market for the coal.

Jisco was the only possible purchaser of No. 1 seam coal of which Ramey was aware. Ramey never sold any No. 1 seam coal to any other user. He knew of no other market for No. 1 seam coal. Jisco requested the aforesaid assignment-sublease arrangement in order to control the coal reserve on the Blood property. Jisco believed that by this arrangement, it could prevent Ramey from selling coal to third parties. Jisco also believed that if Ramey remained a lessee it would have been possible for him to sell coal to Globe Iron Co., Jisco's competitor. By instrument dated February 26, 1949, petitioner sold, assigned, and transferred all of his right, title, and interest in and to the Blood lease referred to above to Jisco, and Jisco assumed all the obligations under the lease and agreed to perform all the conditions thereof.

On July 29, 1949, Jisco and petitioner entered into and executed an agreement entitled "Sublease." After referring to the Blood lease and the assignment thereof by petitioner to Jisco, and reciting that it was the desire of petitioner to mine the coal covered by the lease, this instrument provided that Jisco granted to petitioner the right to enter upon the premises described in the Blood lease (which was attached and referred to as Exhibit A) and to mine and remove the coal therefrom that could be mined by the strip-mining method. Petitioner was to place on the premises all necessary facilities, including strip roadway, machinery, and tipple equipment for the purpose of uncovering, mining, screening, and loading the coal mined, all to be done in accordance with and under the provisions of the Blood lease. This instrument further provided that all coal produced thereunder which was usable by Jisco should be sold to Jisco, which was to be the sole judge of what coal was usable by it. Coal not usable by Jisco could be sold by petitioner as he saw fit except that Jisco was given the first right and option to purchase such coal at a mutually agreed upon price. It was also provided that Jisco was to pay petitioner for the coal mined by petitioner which was usable by Jisco in its blast furnaces the market price based upon a present price of $4.90 per ton at petitioner's tipple, the price to vary up and down as the base price varied.

This sublease also provided that petitioner was to pay Jisco a royalty of 30 cents per ton for each ton of coal produced, on or before the 15th day of each month. If money was due petitioner from Jisco for coal purchased during any month, the amount was to be deductible therefrom by Jisco, otherwise the royalty was to be paid by petitioner to Jisco by the 15th day of each month. Petitioner was also to uncover all of the strip coal that could be mined up to a depth of 40 feet "overburdened" and was also given the right to uncover strip coal up to

6,000 tons when Jisco was not using it but such coal was to be uncovered under the directions and within the limits prescribed by Jisco. Jisco agreed to advance to petitioner the sum of $2.50 per ton for all coal so uncovered. Jisco was obligated to take only such coal as was usable in its blast furnaces in Jackson, Ohio, and was not obligated to take any coal beyond its normal requirements as it might determine.

On August 4, 1952, Jisco purchased the Blood property for a consideration of $27,000 in order that Jisco could better control the coal underlying the property. At about the same time Jisco had the property core drilled to determine the number of tons of coal underlying the property, which was determined to be in the neighborhod of 106,000 tons. Jisco allocated $24,300 of the purchase price to the coal and thereafter claimed cost depletion [2] on all coal mined and removed from the property at the rate of 23 cents per ton. At no time did Jisco claim percentage depletion on the coal mined from the Blood property.

In an instrument entitled "Article of Agreement," dated September 16, 1955, between Jisco, as party of the first part, and Ramey, as party of the second part, reference was first made to the fact that Ramey had for some years past been a "producer, for and on behalf of the Company, of coal" which was highly suitable for use and had been used by Jisco, and then recited that it was desirable that Jisco be assured as large a supply of such coal from the mines and operations of Ramey as Ramey should be able to produce and supply under present conditions, and the parties desired to contract with reference thereto. It was thereafter mutually covenanted and agreed:

(1) Ramey agreed to produce, sell, and deliver, free on board trucks of Jisco at his mine pits, and Jisco agreed to buy and receive from Ramey, such Jackson County No. 1 coal as may be required for the operation of its blast furnaces located at Lick Township, under terms and conditions therein set forth, for a period of 1 year from the date thereof, provided, however, the contract should remain in full force and effect from year to year thereafter unless terminated by either party giving notice in writing to the other 60 days prior to the expiration date of any contract year.

(2) The quantity of coal to be delivered by Ramey and received and paid for by Jisco was so much of the coal produced by Ramey as might be required by Jisco, using maximum requirements then estimated by the parties to be 2,000 tons per month.

(3) The quality and character of the coal to be delivered was to approximate that theretofore delivered by Ramey to Jisco; Jisco was entitled to test each load of coal upon receipt thereof at its blast furnaces and if such coal did not meet its requirements Ramey was given 10 days within which to correct the condition after which Jisco could

---

[2] This was according to the oral testimony of officers of Jisco who did not prepare its tax returns.

cancel the contract in the event the condition was not corrected. The price Jisco was to pay Ramey for the coal was $5.50 per ton and in addition Jisco agreed to pay the United Mine Workers of America Welfare Fund the sum of 40 cents per ton of coal delivered for and on the account of Ramey and to pay the monthly dues to the United Mine Workers of America for and on account of Ramey for his employees. It was agreed that Ramey should not be held responsible for any failure to perform the contract caused by strikes, labor difficulties, acts of God, or other causes beyond his control, but Jisco was to have the first and preferential right to any coal mined by Ramey, before, during, and after such contingency, provided, however, that Jisco reserved the right to cancel the agreement in the event Ramey was unable to supply coal for any reason in the required quantity and quality.

The above agreement of September 16, 1955, made no reference to any particular property from which the coal should be produced. It was a contract for petitioner to produce, presumably from any source available, and sell to Jisco the amount of No. 1 seam coal needed by Jisco for its operations. Presumably petitioner continued to mine coal from the Blood property under the year-to-year sublease dated July 29, 1949, and paid Jisco the tonnage royalty provided under the terms of that sublease for all coal mined from the Blood property.

For a period of several years prior to 1959 petitioner had produced coal and delivered it to Jisco from property other than the Blood property. Although no one else mined coal from the Blood property during this period, the principal executive officer of Jisco in Jackson County at that time believed that because of such fact, and the fact that petitioner had not paid Jisco any royalties during that period, the old lease was automatically terminated and that a new agreement should be entered into by the petitioner and Jisco. This officer, who was not an attorney, drafted such an agreement between Jisco and petitioner which was executed by both parties on May 11, 1959, and was the agreement under which petitioner produced coal from the Blood property during the years here involved, 1960 and 1961, and sold it to Jisco. In this instrument entitled "Article of Agreement" Jisco was referred to as lessor and petitioner was referred to as lessee. After reciting that the lessor was the owner of a certain tract of land in Jackson County, described in metes and bounds therein, and that the lessee desired to enter upon said premises and mine and remove the coal therefrom, it provided, *inter alia*, as follows:

Now THEREFORE, it is agreed as follows:

(1) Subject to the conditions hereinafter set forth, Lessee is to have the right to enter upon said premises and to mine and remove the underlying coal by the strip method and to construct and place upon the property all roadways,

waterways, tipples, equipment and other facilities necessary for the purpose of uncovering, mining, screening and removing said coal.

(2) Said coal shall be removed under the direction of the officers of Lessor and from particular areas of the above described property as designated by the officers of Lessor. Lessor and Lessee shall agree in writing before any particular area is entered upon and in the event of failure to agree in this respect, then all rights of Lessee hereunder shall terminate.[3]

\* \* \* \* \* \* \*

(4) Lessee shall sell the coal produced which is suitable for blast furnace use to Lessor. Lessor shall be the sole judge of the suitability of coal for blast furnace use and shall have the sole right to fix the quantity of coal required for such use. Lessor shall have the first right or option to purchase the coal not suitable for blast furnace use.

(5) The price to be paid for coal delivered to Lessor for use in its blast furnace shall be fixed by separate contract by and between the parties hereto and this lease agreement may be terminated by either party by sixty (60) days notice in writing upon failure to agree upon the terms of such contract or any renewal or extension thereof.

(6) Lessee is to pay a royalty of thirty cents (30¢) per ton for each and every ton of two thousand (2000) pounds of coal mined and removed from said premises. The royalty for coal mined and removed from said premises each month shall be paid on the 15th day of the next succeeding calendar month.

For the purpose of calculating the amount of royalty due, Lessee shall report to Lessor on or before the 10th day of each month the number of tons of coal produced during the preceding month. If money is due Lessee from the Lessor for coal purchased during said month, the amount of the royalty shall be deducted therefrom; otherwise the royalty shall be paid to Lessor by Lessee.

Failure to pay any monthly royalty for coal mined and removed from said premises within thirty (30) days after the same shall become due and payable shall be a forfeiture of this lease and the same shall thereupon become null and void.

(7) Lessee shall guarantee Lessor against any liability for personal injuries or property damage which may arise in connection with the operations of the Lessee upon the premises leased.

(8) In the event of failure or inability of Lessee to produce coal for Lessor as contemplated by this lease and upon the continuation of such failure or inability beyond a reasonable length of time in the light of the circumstances existing at the time, then Lessor shall have the right to terminate this lease upon ten (10) days written notice to the Lessee.

(9) The term of this lease shall be five (5) years unless sooner terminated under the provisions above set forth.

IN WITNESS WHEREOF the Parties hereto have hereunto set their hands on the day and year first above written.

[Signatures omitted]

Attached to the original of the above agreement was the following:

May 11, 1959

Tract to be mined starting this day.

Bound on the north by the high wall, on the west by the property line, on the south by the coal cropline and on the east by the first saddle east from the west property line.

(S)  LESTA RAMEY
(S)  DAVID H. RIDGE

---

[3] In executing the "Article of Agreement," and its predecessors, Jisco believed that the provisions allowing it to control Ramey's extraction of coal were significant.

The area to be mined set out in the attachment was agreed upon by petitioner and representatives of Jisco at about the time the new agreement was executed and all of the coal mined and removed from the Blood property by petitioner and sold to Jisco during the years 1960 and 1961 was mined from this area. Substantially all of the coal which petitioner has mined from 1949 until 1964 was delivered to and used by Jisco, petitioner having never supplied coal for the use of the other company operating blast furnaces in the area. A small amount of the coal mined by petitioner and rejected by Jisco was occasionally sold to others. However, this rejected coal was usually discarded by petitioner because there was no profitable market for it.

During the years 1960 and 1961 petitioner supplied approximately 50 to 60 percent of Jisco's total coal requirements.[4] The No. 1 seam coal which petitioner supplied Jisco during the years 1946 through 1961 was obtained by petitioner from various properties in Jackson County, including the Blood property. During the period 1949 through 1961 petitioner mined coal from properties other than the Blood property from time to time, falling back on the Blood property as his primary source of supply.

During the first 2 months of 1960 petitioner mined and delivered coal to Jisco from the Eisnaugle property and from the Blood property, but throughout the remainder of the year 1960 and all of 1961 petitioner mined coal for delivery to Jisco only from the Blood property. After specifying the mining area in the lease of May 11, 1959, there was no further supervising by Jisco of petitioner's activities either in terms of the area to be mined or in the conduct of his mining operations. No one else mined any coal from the Blood property from 1949 to the date of the trial herein.

During the years in which petitioner produced coal from the Blood property, he provided all of the machinery, equipment, and facilities necessary to carry out the mining provisions from his own funds. This included a tipple and a road leading from the tipple to the highway, a shovel costing $54,000, and two bulldozers costing a total of $36,000. Jisco incurred no expenses with reference to the Blood property except the purchase price of the property, the cost of core drilling to determine the number of tons of coal underlying the property when it was purchased, and possibly some minor incidental expenses in connection therewith.[5]

During the years 1960 and 1961 petitioner received each month from Jisco a check in payment for the coal delivered by petitioner

[4] This percentage remained the same during all the years (1946 through 1964) in which Ramey dealt with Jisco.

[5] There is no direct evidence that Jisco paid out any money with respect to the Blood property except the original cost and the cost of drilling. There is no evidence with reference to who paid any of the local or State taxes with respect to this property.

to Jisco during the preceding month.[6] The voucher or statements attached to each of these checks listed the number of net tons of coal delivered, the source of coal, the purchase price of $5.50 per ton, the UMWA royalty of 40 cents per ton on each ton of coal delivered, and the UMWA dues and assessments for the number of men working. From the totals of these amounts was deducted the royalty on coal delivered from the Blood property at the rate of 30 cents per ton. The vouchers dated February and March of 1960 listed coal from both the Ramey (Eisnaugle) land and the Blood land, the deduction for royalties being computed on the tonnage produced from the Blood land only. For all other months during the years here involved the vouchers listed coal delivered from the Blood property only and both UMWA royalties and the tonnage royalties were computed on the number of tons shown to have been acquired from the Blood property.

On their income tax returns for the years 1960 and 1961 petitioners reported as gross receipts from mining the total of all of the amounts shown on the vouchers referred to above for coal acquired from the Blood and Ramey properties, exclusive of the UMWA royalties and the dues and assessments shown to have been paid thereon. Petitioners also deducted as an expense of mining the total of the royalty shown to have been deducted on the vouchers aforesaid. Petitioners computed percentage depletion on the total amount of coal sales recorded, less the amount of royalty paid, and claimed 10 percent of the net amount as percentage depletion.[7] Depletion claimed for the year 1961 was also limited to 50 percent of the net income from mining.

In his notice of deficiency respondent disallowed the amount of depletion claimed by petitioners on the coal produced from the Blood property for the reason that it was determined that petitioner did not have an economic interest in the coal mined and sold from the Blood property. Respondent allowed petitioner a deduction for depletion for the year 1960 on the coal mined from the "Ramey Property."

OPINION

In the case of mines, oil and gas wells, other natural deposits, and timber, section 611(a), I.R.C. 1954,[8] allows as a deduction in computing taxable income a reasonable allowance for depletion, according to the peculiar conditions in each case, to be made under regulations prescribed by the Secretary or his delegate. In the case of a lease, the

---

[6] No coal was produced during June, July, and August of 1961.

[7] There is a minor discrepancy between the total of the coal sales reported on petitioners' return for 1961 and the total of the amounts shown on the vouchers to have been paid for coal produced. This is probably due to a mechanical error.

[8] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

deduction is to be equitably apportioned between the lessor and lessee. Sec. 611(b)(1). Section 613(a) provides that in the case of mines, wells, and other natural deposits listed in subsection (b) the allowance for depletion under section 611 shall be a percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the properties, limited, however, to 50 percent of the taxpayer's taxable income from the property. Section 613(b) specified a depletion rate of 10 percent for coal and subsection (c) defines "gross income from the property" to mean the gross income from mining, and the term "mining" includes not merely the extraction of the minerals from the ground but also the ordinary treatment processes applied by the mine owners or operators.

Although the above-summarized provisions of the law clearly allow a deduction for percentage depletion in computing taxable income from the mining of coal (unless cost depletion would be greater) there has been considerable doubt and litigation concerning who is entitled to the deduction where several parties are involved in the ownership, extraction, and disposition of the coal or other mineral.

Section 631(c) provides, with respect to coal:

In the case of the disposal of coal * * * held for more than 6 months before such disposal, by the owner thereof under any form of contract by virtue of which such owner retains an economic interest in such coal, the difference between the amount realized from the disposal of such coal and the adjusted depletion basis thereof * * * shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal. Such owner shall not be entitled to the allowance for percentage depletion provided in section 613 with respect to such coal. This subsection shall not apply to income realized by any owner as a co-adventurer, partner, or principal in the mining of such coal, and the word "owner" means any person who owns an economic interest in coal in place, including a sublessor. The date of disposal of such coal shall be deemed to be the date such coal is mined. * * *

The purpose of the allowance of a deduction for depletion is to compensate the owner of wasting mineral assets for the part used up in production. It is designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted the owner's capital is unimpaired. The allowable deduction, in the case of percentage depletion, is a specified percentage of the gross income from the property (from mining) excluding from such gross income (or deducting therefrom) an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the properties. Section 611(b) provides that in the case of leases the deduction is to be equitably apportioned between the lessor and lessee, but under section 631(c) an owner (lessor) of coal who disposes of coal under any form of contract in which he retains an economic interest is

not entitled to percentage depletion but must report his royalties received under the contract as capital gain, unless he participates as a coadventurer, partner, or principal in the mining of the coal. This results, in the ordinary lessor-lessee situation, in the lessee being entitled to the only percentage depletion deduction allowable on the gross income from mining, less the royalties paid by the lessee to the lessor-owner; the lessor-owner reports the gain on the royalties received as capital gain.

But to be entitled to the allowance for depletion the lessee, contractor, or taxpayer who mines the coal must have an economic interest in the coal in place. Section 1.611–1(b)(1), Income Tax Regs., states that an economic interest is possessed by any taxpayer who has acquired by investment any interest in mineral in place and secures, by any form of legal relationship, income derived from the extraction of the mineral, to which he must look for a return of his capital; but this does not include a person who possesses a mere economic or pecuniary advantage from production. The test of who is entitled to a depletion deduction laid down in the above regulation was first enunciated in *Palmer* v. *Bender*, 287 U.S. 551 (1933), and has been approved and followed by the Supreme Court and other courts in numerous cases.

The question before us, whether petitioner, who mined the coal under an agreement with the owner of the coal property, is entitled to a deduction for percentage depletion, thus resolves itself into a question of whether petitioner had an economic interest in the coal in place.

Petitioner contends that he acquired an economic interest in the subject coal in place and is therefore entitled to the claimed depletion deductions. In support of his contention, he argues: (1) The instrument of May 11, 1959, constitutes a lease which characterization is alone sufficient to give petitioner the necessary economic interest; and (2) regardless of whether said instrument constituted a lease, petitioner nevertheless acquired an economic interest in the subject coal in place under the terms of the agreement.

We disagree with petitioner's first argument that the mere characterization of an instrument as a lease is sufficient in and of itself to give the holder thereof an economic interest. The Supreme Court noted in *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U.S. 25, 32 (1946):

Whether the instrument creating the rights is a lease, a sublease or an assignment has not been deemed significant from the federal tax viewpoint in determining whether or not the taxpayer had an economic interest in the oil in place. * * *

See also *Palmer* v. *Bender, supra*. Thus, the relevant consideration is not, as petitioner asserts, the characterization of the instrument under which mining is conducted but whether or not, under the terms

of that instrument, the person conducting the mining secures the requisite economic interest in the mineral in place.

We also disagree with petitioner's second argument that he acquired an economic interest in the coal in place under the terms of the instrument of May 11, 1959, regardless of its characterization. Petitioner attempts to distinguish factually the instant case from *Parsons* v. *Smith*, 359 U.S. 215 (1959), and *Paragon Coal Co.* v. *Commissioner*, 380 U.S. 624 (1965), in which cases the Supreme Court determined that the miners involved did not possess the requisite economic interest. The *Parsons* and *Paragon Coal* cases are substantially similar and we do not believe that anything can be gained by an extended comparison of the facts before us to both of those cases. We will, therefore, limit our discussion to the more recent *Paragon Coal* decision.

In that case Paragon acquired by assignment written leases on the coal in and underlying certain tracts of land and assumed all the obligations of the lessees under the leases. The leases required *the lessee* (1) *to mine all* or 85 percent of the minable coal in and underlying the tracts under lease and (2) to pay annual minimum royalties, tonnage royalties, and land taxes.

Paragon chose not to mine the coal itself but entered into an oral agreement with various individual (miners) whereby said miners were to mine the coal at their own expense and deliver it to Paragon at its tipple. These miners were to be paid a fixed fee for their mining activities. Paragon agreed to take all the merchantable coal and the record therein does not show any deliveries by the miners to third parties. Paragon would then sell the coal on the open market.

The miners in *Paragon Coal* were not required to mine to exhaustion and could cease their activities at any time. Paragon maintained control over the coal and could direct the miners to limit their operation to specified areas. At no time were the miners required to pay any part of the royalty or land taxes required by Paragon's leases. The Supreme Court held, affirming this Court, that Paragon was entitled to the entire allowance for depletion because the miners had not acquired any economic interest in the coal in place.

As in the case of the miners in *Paragon Coal*, petitioner herein was not given the right to mine all the coal in any particular seam underlying the Blood property nor was he obligated to mine or pay for any specified amount of coal. He was not required to pay minimum annual royalties.

As in *Paragon Coal*, we are not persuaded that Jisco actually surrendered to petitioner any capital interest in the coal in place. In fact, Jisco's major consideration throughout all its transactions with petitioner was the maintenance of control over the Blood property. There is nothing in any of the series of agreements between petitioner and

Jisco which suggest that petitioner would be able to sell No. 1 seam coal to a third party in the event that Jisco did not require it. There is no reason to infer otherwise. The language of the agreements specifically allowed petitioner to sell to third parties only that coal which was not suitable to Jisco. Jisco's vice president testified at the trial proceeding herein that the purpose of the so-called lease agreements was to prevent petitioner from selling No. 1 seam coal to competitors. Moreover, during the entire course of dealings between Jisco and petitioner, petitioner never supplied more than 50 to 60 percent of Jisco's total coal requirements. Thus, even if the agreements, on their face, did allow petitioner to sell No. 1 seam coal to third parties, such event was so unlikely that it could not have been considered a substantial benefit or right meaningful to petitioner when the parties entered into the 1959 instrument. Petitioner's sales of slag to third parties were *de minimis* and the market therefor was unprofitable.

As in *Paragon Coal*, petitioner was paid what appears to have been in fact a fixed fee for his services. In an agreement dated September 16, 1955, petitioner and Jisco agreed, *inter alia*, to a price of $5.50 per ton for coal delivered to Jisco. This price remained in effect from that date up through the years in issue. Because this price has remained unchanged for a period of approximately 6 years and because petitioner has not shown that this price in any way reflected the market price for No. 1 seam coal, we can only infer that for the years in issue, 1960 and 1961, the price paid was not substantially related to the market price.

Petitioner stressed that the provision calling for the payment of a royalty by him to Jisco of 30 cents per ton for each ton mined and removed from the Blood property constituted an investment by him in the coal in place within the meaning of section 1.611–1(b)(1), Income Tax Regs. Petitioner seems to conclude, though he does not specifically so state, that this alleged royalty payment distinguishes the case at bar from the Supreme Court decisions in the *Parsons* and *Paragon Coal* cases. We cannot agree. It is our opinion that, in reality, the alleged royalty of 30 cents per ton is no more than an offset or reduction in the price that Jisco agreed to pay where the coal was mined from its own property. It was not a true royalty. We think it significant that the vouchers produced show that the royalty payments were, in each instance, computed on the exact tonnage that had been delivered to Jisco. It, therefore, appears that for the years in question petitioner paid only the 30 cents per ton on coal that was actually delivered to Jisco. Nowhere has the petitioner shown that he actually paid the 30 cents per ton for any amount of coal mined that was not acceptable to Jisco. We, therefore, conclude that in substance the 30 cents per ton was no more than a reduction in the price which Jisco would pay where

the coal delivered was mined from its own property. Because this is not a true royalty we do not think that this provision of the agreement operates to distinguish the petitioner from the miners in the *Parsons* and *Paragon Coal* cases.

Finally, in *Paragon Coal*, the contracts were not made for any specific period of time and nothing was said about the right to terminate by either party at the time the agreements were executed. However, this Court found as a fact that it was anticipated by both parties that the mining contractor would continue mining in the location assigned to him as long as the contractor employed proper mining methods and produced coal meeting Paragon's specifications. Although the 1959 instrument in the instant case states that its term "shall be five years," it was to terminate upon 10 days' written notice to the lessee in the event of failure or inability of petitioner to produce coal for Jisco as contemplated by the instrument.

It is our opinion that the case at bar is controlled by the Supreme Court's decisions in the *Parsons* and *Paragon Coal* cases. By this, we do not mean to suggest that a mining contractor may never possess the requisite economic interest so as to warrant the allowance of a deduction for depletion. We simply do not believe that the factual situation presented herein differs substantively from that presented in those cases as to require a different legal conclusion. Accordingly, we hold that petitioner did not have an economic interest in the coal in place and is, therefore, not entitled to any depletion allowance on the facts before us.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

DRENNEN, *J.*, dissenting: I must respectfully dissent despite the fact that I was what might be regarded as the progenitor of the *Paragon Coal Co.* case upon which the majority relies so heavily, having written the opinion of this Court in that case, the decision in which was affirmed by the Supreme Court in the cited reference. In my opinion this case is factually distinguishable from both the *Paragon* case and the *Parsons* case, and upon the facts of this case the taxpayers acquired an economic interest in the coal which entitles them to a deduction for percentage depletion under the law and the decided cases. The majority opinion does not really discuss the law as applied to the facts in this case but contents itself with rewriting or placing what I consider a strained interpretation on the terms of the written agreements between the parties so as to make this case factually similar to the *Paragon* case, and then concluding that the *Paragon* case is dispositive of the issue in this case.

In my opinion this result is accomplished only by ignoring a large part of the language used by the parties in their written agreements and ascribing to the parties relationships to the mineral to be mined that neither the terms of the agreements, the past history of the arrangements between the parties, nor anything in the record justifies.

The principal factors which I believe distinguish this case from the *Paragon* case are as follows. I will discuss them in the order discussed in the majority opinion where similar.

As in *Paragon*, petitioner here was not specifically required, nor given the right, to mine any area to exhaustion, but he was required to mine the area in a manner consistent with good mining practices. This factor, often referred to in the depletion cases, but said not to be controlling in Justice Clark's opinion in the *Paragon* case, might have different connotations in strip-mining operations than it has in deep-mining operations. However, unlike in *Paragon*, where the lessee gave the miners specific instructions on the directions in which they should mine and supervised their operations, here Jisco simply designated an area to be mined and gave petitioner no further instructions or supervision with respect to his operations.

In *Paragon* the miners paid no royalty to anyone for the coal mined. Here, unless the royalty specifically provided for in the agreement and accounted for on the vouchers as such is treated as a reduction in a fee paid to petitioner for mining the coal (which is nowhere mentioned in the agreements), as the majority has done, petitioner was required to pay 30 cents per ton for every ton of coal mined from the Jisco property. In my opinion this is a very important distinction in the two cases and should not be passed off by saying that it "was not a true royalty" but was "in substance no more than a reduction in the price which Jisco would pay where the coal delivered was mined from its own property" when there is nothing in the record to support such a conclusion.

The mere fact that for the years in question petitioner paid 30 cents per ton only on coal delivered to Jisco does not support the conclusion that this was not a true royalty. The arrangements between the parties clearly contemplated that Jisco would take all of the coal mined by petitioner from this property if it needed it, and there is nothing to indicate that it did not need all of it. When petitioner originally obtained the lease on this property from the Bloods he agreed to pay a royalty of 30 cents per ton on all coal strip mined, and that royalty provision was simply carried over into this lease between Jisco, which by this time was the owner of the property, and petitioner. The evidence shows that petitioner mined coal from other properties under leases whereby he paid the owner a similar royalty and sold this coal to Jisco at the same price. We see no reason why the parties would engage in the elaborate process of providing for a royalty in the lease,

and doing the accounting necessitated thereby, if the royalty was in fact only a reduction in a fee paid to petitioner to mine the coal, unless there was collusion between Jisco and petitioner to avoid taxes, and I find absolutely no evidence in the record to either indicate or support such a conclusion.

Here, unlike in *Paragon*, I am persuaded that Jisco actually surrendered, and intended to surrender, a capital interest in the coal in place to petitioner. Jisco apparently had no interest in the coal in place, except to control it as a source of supply, which it effectively did by having an option to purchase all the coal produced. Nor was Jisco interested in mining the coal itself. It could therefore safely sell a capital interest in the coal in place to petitioner without damaging its own interests, and that is what it did under the terms of the written agreement. Paragraph (1) of the agreement gave petitioner the right to mine and remove the coal from the property and paragraph (6) required petitioner to pay a royalty of 30 cents per ton for each and every ton of coal mined and removed from said premises. Paragraph (4) provided that petitioner should "sell" the coal produced to Jisco, and gave Jisco the option to "purchase" the coal not suitable for blast furnace use. Paragraph (5) referred to the "price to be paid for coal" delivered to Jisco. The terms of the written agreements clearly contemplate the arrangements in a typical coal lease where the lessee is given the exclusive right to go on the property and mine and remove the coal, in return for which he pays a tonnage royalty for the valuable right of removing and reducing the coal to possession. The only difference here is that under this agreement Jisco had the option to buy all the coal produced. I doubt that even this provision is unusual in modern day coal leases where so much of the coal produced is delivered to electric power companies under long-term contracts. In any event, it should not serve to limit or restrict the lessee's capital or economic interest in the coal in place; nor should the fact that, under the circumstances existing, it was contemplated that petitioner would sell most, if not all, of the coal mined to Jisco.

Here, unlike in *Paragon*, the agreement was for a specified term— 5 years. The majority discounts this distinction between the cases by pointing to the provision permitting Jisco to terminate the lease upon 10 days' notice in the event of the failure or inability of petitioner to produce coal for Jisco as contemplated by the lease. It appears to me that a careful reading of the entire paragraph (8), in which the above provision is contained, clearly contemplates a right to terminate only for cause, reasonably exercised, and I know of no cases which hold that the right of the lessor to terminate a lease for reasonable cause deprives the lessee of an economic interest in the property.

The majority opinion relies on the fact that because the price to be paid petitioner for the coal apparently remained unchanged for a period of 6 years, and petitioner offered no evidence that this price reflected market price, to infer that the price paid was not related to the market price. In my opinion such an inference is entirely unwarranted. Under the circumstances here present the market price of this particular coal in this particular area was not apt to fluctuate as does the price of coal sold on the open market. The price paid was agreed upon between unrelated parties in arm's-length negotiations. The lease itself left the price open for negotiation. The amount paid under these circumstances is, in my opinion, the best evidence of market price and petitioners should not be called upon to produce any additional evidence.

In *Paragon* the Court pointed out that all of the miner's investment was in movable, depreciable equipment, not in the coal in place. Here petitioner had an additional investment in the coal by virtue of his royalty payments. In *Paragon* the coal, even after it was mined, did not belong to the miners, they could not sell it to anyone else or keep any of it, they were not entitled to any part of the proceeds of the sale of the coal, and they were required to look only to Paragon Coal Co. for all sums to become due them under their contracts. Here, if I interpret the agreement correctly, the coal belonged to petitioner after it was removed, with Jisco having the option to purchase it, petitioner could sell any coal not taken by Jisco on the open market, or could use it himself, petitioner received all of the proceeds from the only sale of the coal which was made, because Jisco used it and did not resell it, and while petitioner apparently did receive all sums he received from the removal and sale of this coal from Jisco during the years here involved, he was not required to look only to Jisco for a return of his investment under the terms of the agreement.

For the above principal reasons I think this case is factually different from the *Paragon* and *Parsons* cases and should not necessarily be controlled by those cases. Of course, I realize that just because the facts in this case are different from those in *Paragon* and *Parsons* this would not automatically entitle petitioner to a deduction for percentage depletion. However, I believe that the facts in this case, as discussed above, bring it within the principles of law enunciated in the opinions in those two cases and the numerous other cases cited therein, and in fact with the principles of law enunciated in the majority opinion in this case, which allow the lessee-miner a deduction for percentage depletion. I do believe that I have demonstrated in my discussion above that the factors relied upon in *Parsons* and *Paragon* to deny the miners the depletion deduction there are not present in this case.

It is not so much disagreement as to the basic principles of law as it is in the application of those principles to a given factual situation which causes the confusion and uncertainty in the percentage depletion area. I agree with the majority opinion's statement of the purpose for the allowance of a deduction for depletion and its statement of the basic requirements of the law for the allowance of the deduction.

The depletion deduction is allowable only to the owner of an economic interest in the mineral deposit and such an economic interest is possessed by a taxpayer who has acquired by investment any interest in the mineral in place and secures, by any form of legal relationship, income derived from extraction of the mineral to which he must look for a return of his capital; and a contractual arrangement which gives the taxpayer only an economic advantage derived from production is not enough. Sec. 1.611–1(b)(1), Income Tax Regs. Legal title to the mineral deposit is not required and a lessee who has the exclusive possession of the deposits and the valuable right of removing and reducing the mineral to possession has a substantial interest therein, *Lynch* v. *Alworth-Stevens Co.*, 267 U.S. 364 (1925); such title as might be required for the depletion deduction would appear to vest in him not later than when the mineral is mined. The form of the instrument under which the taxpayer derives this interest is not significant; this interest may be acquired through the payment of royalties or other investments in the property, and the cost of the investment is unimportant. *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U.S. 25 (1946). This interest is property within the meaning of the depletion statutes, *Lynch* v. *Alworth-Stevens Co.*, *supra*, and if the lessee must look to the mining and sale of the mineral for the recovery of his investment and his "possibility of profit" he is entitled to a deduction for depletion against his gross income from mining.

Prior to the effective date of the present section 631(c), if the owner-lessor of the mineral property retained an economic interest in the mineral under the terms of the lease agreement, the depletion deduction was equitably apportioned between the lessor and lessee. With respect to percentage depletion this apportionment was effectuated by requiring the lessee to deduct from his gross income from the property, before applying the depletion rate, all rents and royalties he was required to pay for the use of the property; the lessor using the royalty income as his share of the income from the property against which he deducted depletion. Under section 631(c) the owner-lessor is not allowed to deduct percentage depletion but may treat the royalties received as income from the sale of a capital asset, deducting from the royalty income a proportionate part of his investment in the property in computing his profit. This does not, however, serve to change the lessee's right to compute depletion only on his proportionate share of

the income from the property, i.e., after reduction by the royalties paid. See *Paragon Coal Co.* v. *Commissioner*, 380 U.S. 624 (1965).

For the reasons stated above, I think that under the terms of the controlling instruments in this case petitioner meets all the requirements of the law for the allowance of a percentage depletion deduction; and I find nothing in the record to justify refusing to accept those documents at face value. I think the parties intended to and did give petitioner an economic interest in the coal in place, which he acquired by investment, that petitioner's interest was depleted as the coal was removed, and that petitioner had to look to the production and sale of the coal to recover that investment. This should entitle petitioner to the depletion deduction.

If the majority opinion is intended to stand for the proposition that simply because a lessee grants to the owner-lessor an option to purchase all of the mineral produced under the lease, the lessee acquires no depletable economic interest in the coal, I also disagree with it on that score.

FORRESTER, SCOTT, DAWSON, and TANNENWALD, *JJ.*, agree with this dissent.