DELBERT R. AND JACKIE A. STURGILL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sturgill v. Commissioner
Docket No. 9269-84.
United States Tax Court
T.C. Memo 1987-86; 1987 Tax Ct. Memo LEXIS 82; 53 T.C.M. (CCH) 120; T.C.M. (RIA) 87086; February 12, 1987. *82 Petitioner mined coal for a dollar amount per ton under a mining agreement with the owner of the coal in place. Held: Petitioner had no economic interest in the coal and was not entitled to a deduction for depletion. Carle E. Davis,Robert E. Draim, *83 Kurt R. Magette and Gerald E. Wilson, for the petitioners. Scott Anderson and Marion B. Morton, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioners' Federal income tax for taxable years ending December 31, 1981 and 1982 in the amounts of $1,146.04 and $51,690.16, respectively. After concessions [1], the only remaining issue in this case is whether petitioners are entitled to certain depletion deductions based on petitioners' mining activities in calendar years 1981 and 1982. FINDINGS OF FACT Petitioners Delbert R. Sturgill and Jackie A. Sturgill are husband and wife whose legal residence at the time they filed their petition herein was Wise, Virginia. Petitioners filed Federal income tax returns for calendar years 1981 and 1982 with the Internal Revenue Service Center, Memphis, *84 Tennessee. On or about November 12, 1982, petitioners filed an amended Federal income tax return for calendar year 1981, which claimed a refund in the amount of $39,403.80, with the Internal Revenue Service Center, Memphis, Tennessee. During calendar years 1981 and 1982, Delbert R. Sturgill operated a sole proprietorship under the name Sturgill Mining Company ("Sturgill Mining"). Since no items involving Jackie A. Sturgill are in controversy in this case, Delbert R. Sturgill and Sturgill Mining are hereinafter collectively referred to as "petitioner." Petitioner, an experienced coal miner, was certified by the State of Virginia as competent to operate a coal mine in accordance with good mining practices. [2]
Petitioner entered into a mining agreement dated November 1, 1981 (the "mining agreement") with Flat Gap Mining, Inc. ("Flat Gap"). The mining agreement provided that petitioner would *85 mine coal from the Taggart seam of coal through two mine portals in Wise County, Virginia designated as "Mine A" and "Mine B" using "deep mining" methods. [3] The mining agreement was to continue until the earlier of "two years from the date of execution hereof, or, until all of the mineable and merchantable coal has been mined to exhaustion * * *" The mining agreement could also be terminated by petitioner's default thereunder. Paragraph 3(a) required petitioner to deliver its "total daily production to a loading facility designated by (Flat Gap)." Flat Gap was required to deliver approximately 10,000 tons of coal a month. Paragraph 3(b), stated petitioner would be paid a price of $34 per "clean ton" for all "merchantable and marketable coal" mined pursuant to the agreement, and provided "the price per ton . . . may vary according to deviations in the market." Paragraph 3(d) provided that an amount equal to $2 per "clean ton" would be withheld from payment to petitioner and be placed "into a non interest bearing escrow account (the "escrow account") as security for the faithful compliance of (petitioner) hereunder." The mining agreement stated that Flat Gap was the "lease hold owner" *86 of the coal but was silent as to allocation of depletion allowances and economic interests in the coal in place. Petitioner and Flat Gap engineers inspected the mines and designated the areas of Mine A and Mine B that were economically feasible to mine. Both Mine A and Mine B contained Taggart coal, a metallurgical grade coal distinguished from steam coal by its high coke quantity and high BTU rating. Because of its unique characteristics, Taggart coal ordinarily brings a premium price on the open market equal to approximately $15 per ton higher than steam coal during the years in issue in this case. The coal mined in both Mine A and Mine B contained ash, an impurity which Flat Gap would "wash out" of the coal ore to produce "clean coal." Petitioner was paid by the number of "clean tons" [4] of coal delivered to Flat Gap. Petitioner delivered *87 pre-washed coal to Flat Gap's tipples. Flat Gap then washed the coal ore to remove the ash and reported to petitioner, the day after petitioner delivered the coal ore to the tipple, the resulting clean tonnage. Mine A yielded coal with low ash and a low reject percentage. Mine B had more ash and a higher reject percentage than Mine A. The reject percentage of coal mined from Mine A and Mine B varied on a daily basis. The reject rate of coal mined from Mine A during the term of the mining agreement varied from 23.14 percent to 30.01 percent, while the reject rate for coal mined from Mine B varied from 32.27 percent to 49.10 percent. The average reject rate for coal mined from Mine A during the term of the mining agreement was 26.24 percent compared to 42.38 percent for coal mined from Mine B. Because of its relatively low ash content, Mine A was more profitable to mine than Mine B. To ensure that petitioner worked Mine B and not just Mine A, the mining agreement provided that $2 per clean ton, otherwise payable to petitioner, be withheld by *88 Flat Gap and placed in the escrow account. [5]
In addition to the mining agreement, petitioner entered into a conditional *89 sales agreement dated November 1, 1981 (the "purchase agreement") with Flat Gap. The purchase agreement provided that petitioner would purchase certain equipment from Flat Gap for a purchase price of $290,000, payable at the greater of: (i) $20,000 per month, or (ii) $3 per clean ton mined under the mining agreement. On May 15, 1982, petitioner made the final payment for the equipment he purchased from Flat Gap under the purchase agreement. Final payment consisted of a transfer of the money released from the escrow account ($110,130.32) plus $14,674.20 withheld by Flat Gap from payments due taxpayer for coal mined from April 16, 1982 through April 30, 1982. Neither petitioner nor Flat Gap intended at the time of entering into the mining agreement that the funds in the escrow account be used by petitioner as part of the purchase price of the equipment. Mine A and Mine B were both "panel mines." Under the United Mine Workers Association ("UMWA") rules, a panel mine must be operated by certain designated members of UMWA known as a "panel." The panel involved in Mine A and Mine B consisted of men with high seniority. As a result, petitioner incurred premium labor costs, including *90 substantial fringe benefits under the panel's union contracts with petitioner. As of November 15, 1981, petitioner had delivered to Flat Gap 3,415 clean tons from Mine A and 2,397 clean tons from Mine B for a total gross price due petitioner of approximately $197,500. Due to a general collapse of the market for Taggart coal, Flat Gap was unable to sell all the coal mined by petitioner so the Mining Agreement was terminated by mutual consent under a letter agreement dated October 7, 1982. OPINION Since enactment of the Internal Revenue Code of 1913, Federal income tax law has allowed a special deduction for the depletion of wasting assets. The purpose of the deduction is to compensate the owner of the wasting asset for the part used up in production. Helvering v. Bankline Oil Co.,303 U.S. 362, 366 (1938). In Commissioner v. Southwest Exploration Co.,350 U.S. 308, 312 (1956), the Supreme Court stated the depletion deduction was "designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired." Section 611(b)(1)[6] provides that where wasting assets *91 are leased, the depletion deduction shall be "equitably apportioned between the lessor and lessee." Since minerals are extracted under numerous legal relationships between the owner of the minerals and the extractor, the question of who is entitled to the depletion deduction has continually been litigated in the courts. Addressing the depletion of oil deposits, in Palmer v. Bender,287 U.S. 551 (1933), the Supreme Court held: The language of the statute (the predecessor to IRC sections 611 and 613) is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital * * *. It is enough if * * * he has retained the right to share in the oil produced. If so, he has an economic interest in the oil, in place, which is depleted by production. * * * [Palmer v. Bender,supra at 557.] The "economic *92 interest" test established by the Supreme Court in Palmer v. Bender,supra, has been explained in section 1.611-(1)(b)(1), Income Tax Regs. That regulation provides, in relevant part, that: A person who has no capital investment in the mineral deposit * * * does not possess an economic interest merely because through a contractual relationship he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter * * * to compensation for extraction * * * does not convey a depletable economic interest. * * * The parties agree if petitioner can establish that he had an economic interest in the mineral deposits covered by the mining agreement, petitioner would be allowed depletion deductions in the amounts of $74,671.96 and $136,895.26 in calendar years 1981 and 1982, respectively. In Parsons v. Smith,359 U.S. 215 (1959), the Supreme Court listed seven factors which indicate that a contract miner before it had no "economic interest" in the coal he mined. In Paragon Jewel Coal Co. v. Commissioner,380 U.S. 624 (1965) *93 revg. Merritt v. Commissioner,330 F.2d 161 (4th Cir. 1964), revg. 39 T.C. 257 (1962), the Supreme Court used those factors to develop a test to determine whether or not coal mining contracts gave contract miners any "economic interest" in coal in place. The Court listed those factors as follows: (1) that (the coal miners') investments were in their equipment, all of which was movable - not in the coal in place; (2) that their investments in equipment were recoverable through depreciation - not depletion; (3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to (the contract miners) any capital interest in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that (the contract miners) could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that (the contract miners) were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered * *94 * *; and (7) that (the contract miners), thus, agreed to look only to the landowners for all sums to become due them under their contracts. We view the principles established by the Supreme Court in Paragon as controlling for our purposes. Tested against the seven factors listed in Paragon, we conclude petitioner did not have an "economic interest" in the coal he mined. The first two factors of the Paragon test relate to what investments were made by the coal extractor and how those investments were recovered. Petitioner argues he made "substantial expenditures for fixed costs, such as labor, permits, licenses, and maintenance, which were recoverable if at all only through production of coal." While the evidence does support petitioner's claim that he incurred premium labor costs under the UMWA contract, the cost of labor, permits, licenses and other similar operating expenditures are not different from those incurred by the taxpayer in Paragon. The taxpayer in Paragon was required to "provide his own men, equipment, chutes, and bins, and to extend a road built by Paragon to the mine portal if necessary. All expenses of opening and operating the mine were *95 borne by the contractor". 39 T.C. at 275. The "premium" petitioner paid for labor does not entitle petitioner to claim an economic interest in the coal itself. Our focus is on the nature of the expenditure, not the amount. Petitioner further argues that "petitioner's escrow payments in combination with his obligations to mine substantial quantities of merchantable and marketable coal is economically equal to a royalty payment" and infers that the "royalty payment" evidences his investment in the coal in place. In support of his argument, petitioner cites a dissent to the majority opinion in Ramey v. Commissioner,47 T.C. 363 (1967), wherein the author of this opinion stated that a royalty paid by the contract miner to the lessee was one factor which distinguished the contract miner in that case from the situation presented in Paragon.However, the situation in Ramey is factually dissimilar to the one in the instant case. In Ramey the majority stated that the royalty, specifically provided in the mining agreement, was "in substance * * * no more than a reduction in the price which (taxpayers) would pay where the coal delivered was mined *96 from its own property." 47 T.C. at 375. This author dissented to the majority's conclusion because nothing in the record supported the conclusion that the arrangement was not a true royalty. This is not true in the instant case. The contract between petitioner and Flat Gap clearly states that the purpose of the escrow account was to secure petitioner's faithful compliance with "each and every covenant, term and condition of the agreement." Petitioner and James LaForce, general manager of Flat Gap, testified that the purpose of the escrow account was to assure that petitioner mine coal from Mine A and Mine B and to protect Flat Gap in the event petitioner concentrated his mining efforts on the coal located in Mine A. The mining agreement states, and petitioner and his witness verify, the meaning and intent of the parties in establishing the escrow account. The escrow account more closely resembles a liquidated damages provision than a royalty. No where in the mining agreement, or in any testimony before this Court, has it been suggested that the purpose of the escrow account was to serve as the economic equivalent of a royalty payment. A royalty payable on coal mined *97 is payable in any event -- the amount placed in escrow here was paid to petitioner for mining the coal and was payable to Flat Gap only for petitioner's failure to perform terms of the agreement -- it was not paid for either coal or the right to mine coal. The third factor cited in Paragon is whether or not the mining contract was terminable without cause or on short notice. Petitioner argues he had "an nonterminable right and obligation to mine coal in a particular area until exhaustion." Thus he distinguishes his contract from the one found in Parsons which the court found to be "completely terminable without cause on short notice." 359 U.S. at 227. The "term" of the mining agreement ended upon the earliest to occur of: two years from the date of execution; until the "mineable and merchantable coal" had been mined to exhaustion; or until the mining agreement was terminated pursuant to its terms. Besides the two-year period and mining to exhaustion, the mining agreement could only be terminated by the default of petitioner under the mining agreement. Petitioner was obligated to mine at least 10,000 clean tons of coal per month. Both Flat Gap and petitioner *98 testified the parties contemplated that petitioner would mine both Mine A and Mine B to exhaustion before the end of the two-year period. Petitioner argues, therefore, the mining agreement conferred upon him the right to mine until exhaustion of the coal reserves. Petitioner's production under the mining agreement substantiates petitioner's claim that both Mine A and Mine B would have been exhausted before expiration of the two-year period. After only seven months of production, Mine A was approximately one month from exhaustion and Mine B was approximately one year from exhaustion. We conclude petitioner had an implied nonterminable right to mine coal until exhaustion. The Supreme Court has recognized that a nonterminable right to mine until exhaustion minerals in a particular area is "a very real and substantial interest" in such mineral. Lynch v. Alworth-Stephens Co.,267 U.S. 364, 369 (1925). However, the Supreme Court stated in Helvering v. Bankline Oil Co.,303 U.S. 362, 367 (1938) and again in Paragon that "the right to mine even to exhaustion, without more, does not constitute an economic interest under Parsons, but is a mere economic *99 advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit." 380 U.S. at 634-635. The right of petitioner to mine coal from certain areas to exhaustion, or until the agreement was terminated by time or some other reason alone, gave petitioner no economic interest in the coal in place. The fourth factor is whether or not the landowner agreed to surrender or did actually surrender to the contract miner any capital interest in the coal in place. Petitioner argues "Section 3(b) of the mining agreement states that Flat Gap would pay petitioner 'for all merchantable and marketable coal mined hereunder . . .' this phrase and the remainder of the mining agreement indicate that Flat Gap was paying petitioner for coal and not for services." Petitioner does not state what additional language in the mining agreement supports his claim, and we cannot find any. We are to infer the above language indicates Flat Gap conferred, or at least acknowledged, petitioner's capital interest in the coal in place. Petitioner's argument is meritless. In this regard, petitioner and the contract miner in Paragon *100 are indistinguishable. To hold otherwise would infer that every owner of mineral deposits necessarily confers upon the extractor a capital interest in the mineral in place. This would nullify the analysis established by the Supreme Court in Paragon, for every contract miner would have a depletable economic interest. Flat Gap did not agree to surrender and did not actually surrender to petitioner any capital interest in the coal in place. The fifth factor listed in Paragon relates to who has control over the coal both before and after it is mined. Specifically, we are required to determine whether petitioner "could not sell or keep any of (the coal) but was required to deliver all that he mined to the landowners." Petitioner does not claim he had any control over the coal before it was mined. Instead, petitioner argues that "when the metallurgical coal market collapsed, petitioner independently verified that there were no other purchasers for his coal." Apparently, we are to conclude from this argument that petitioner was not required to deliver all the coal he mined to Flat Gap but could sell the coal to third parties. Petitioner's direct testimony on this point is as *101 follows: THE COURT: Weren't you required to sell all the coal that you mined back to Flat Gap? THE WITNESS: Yes, sir, to an extent, but when he (Flat Gap) got to the point that he absolutely lost all his market, it was a mutual agreement that I could take it wherever I wanted to and if I could sell it, that was fine. Under the mining agreement petitioner was required to deliver all coal mined to Flat Gap. Only when the market collapsed was petitioner allowed by "mutual agreement," to try to find a market for the coal. Although Flat Gap, in the eleventh hour, may have waived its right to require delivery to it of all coal mined by petitioner, this does not necessarily entitle petitioner to sell the coal upon terms he alone deemed appropriate. Furthermore, even if petitioner had found a market for the coal there is no indication that Flat Gap would not have required petitioner to deliver all proceeds from the sale to Flat Gap, or in the alternative, insist that Flat Gap sell the coal to the purchaser as was the customary business practice. There is insufficient evidence to conclude petitioner could have acted in any capacity other than a mere agent in a sale to a third party. *102 We find such a role, particularly one which was never fulfilled by petitioner, inadequate to conclude petitioner had an economic interest in the coal in place. The sixth and seventh factors of the Paragon test focus on whether petitioner received a "fixed sum" for the coal delivered to Flat Gap and whether petitioner looked only to Flat Gap for payment for the coal he mined under the mining agreement. The mining agreement provided that the price per ton paid to petitioner "may vary according to deviations in the market" and in fact, payments to petitioner did occasionally vary. [7] Petitioner argues that the phrase "merchantable and marketable coal" contained in the mining agreement meant that "petitioner agreed to produce and sell, and Flat Gap agreed to purchase, only coal that produced a reasonable profit for both petitioner and Flat Gap. As Flat Gap admitted at trial, petitioner had to look to the eventual sale to an ultimate customer for petitioner's return on his investment in coal in place." We disagree with petitioner's analysis of testimony given at trial. The finality of the sale at Flat Gap's tipple is evidenced by testimony given by James LaForce as follows: *103 QUESTION: * * * What happened or why did you stop selling coal to Alla-Ohio? That's the company that you were selling the export coal -- ANSWER: They went bankrupt. QUESTION: They went bankrupt so you lost that market. ANSWER: That's correct. QUESTION: When they went bankrupt, did they owe you for any of the coal which you shipped to them? ANSWER: Yes. QUESTION: Did you attempt to get -- Did some of the coal that you shipped to them come from Delbert Sturgill (petitioner)? ANSWER: Yes. QUESTION: Did you attempt to go back to Delbert Sturgill and get some money from him for that coal that wasn't paid for? ANSWER: No, because we had sold the coal and had a bad debt. We didn't see any -- QUESTION: So once Delbert Sturgill's coal went through your tipple and you washed it and you found out what the ash content was, that's when you figured out how much you owed him, is that correct? ANSWER: We figured out how much we owed him after we had analyzed the raw coal and determined the number of clean tons. QUESTION: So even before you washed it you could look at it and tell how much -- ANSWER: There was enough history there to know that the product would be what *104 we wanted it to be when we washed it. QUESTION: So at that point, your liability for the payment of coal to Sturgill was fixed, right? ANSWER: That's correct. As is evident from the above testimony, Flat Gap's liability to petitioner was fixed when the coal was washed to yield its clean tonnage. At that point, petitioner was entitled to payment for all clean tonnage delivered. Petitioner had no contractual or beneficial right to seek payment for the coal or his services from any one other than Flat Gap. It is true petitioner was dependent in the long run on the market for the Taggart coal. As the market dissipated, petitioner's services were no longer required. We find this to be indistinguishable from the risk taken by any service provider that the recipient of the services might decide that the services are no longer required. Such a risk does not vest petitioner with *105 an economic interest in the coal in place, but rather an economic interest in a continuing business relationship. Viewed in its best light, petitioner had a contract to mine coal, impliedly to exhaustion, for a stated price per ton which could vary with market fluctuations. But these factors alone did not give petitioner an economic interest in the coal in place which he must have to be entitled to a deduction for depletion. Petitioner had no ownership interest in the coal before it was mined, he did not own it before or after it was delivered to Flat Gap's tipple, and he had no right to, nor did he, sell the coal. Petitioner paid nothing for the coal and he received nothing directly from the sale of the coal. He was paid for his services in mining the coal and delivering it to Flat Gap's tipple and his only investment was in acquiring the equipment and paying the expenses necessary to render those services. Because petitioner lacked an economic interest in the coal he mined, he is not entitled to the depletion deductions he claimed. Decision will be entered for the respondent.
Footnotes
1. Petitioners concede (i) the disallowance of a deduction for supplies in the amount of $1,965.03 in calendar year 1981, (ii) a depreciation deduction in the amount of $2,387.50 in calendar year 1982, and (iii) investment tax credit in the amount of $573 in calendar year 1982.↩
2. Petitioner holds a First-Class Certificate of Competency issued by the Commonwealth of Virginia's Department of Mines, Minerals and Energy. To be eligible for the certificate, petitioner had to have worked in a coal mine for five years or more and had to pass a written examination.↩
3. "Deep mining" methods involve extraction of coal or other minerals found underneath the earth's surface by underground mining and removal through portals made in the surface. This method is distinguished from "strip mining" which is the removal of coal or other minerals found on or near the earth's surface by removing the overburden.↩
4. The mining agreement defines clean tons as "tonnage delivered (-) [tonnage delivered times (X) (percentage of ash (+) 10%)]."↩
5. The parties stipulated that "the purpose of the escrow account was to ensure that (petitioner) worked Mine B and not just Mine A." At trial, petitioner testified that the purpose of the escrow account was to provide incentive to petitioner for mining Mine A and Mine B and↩ as a punitive measure against petitioner should he default under any provision of the mining agreement. Respondent objected to this testimony stating that the stipulation, signed by petitioner, spoke for itself and could not now be controverted at trial. After consideration of the testimony of petitioner and Mr. James LaForce, "general manager" of Flat Gap at the time petitioner mined coal for Flat Gap, we find that the purpose of the escrow account was as stated in the Stipulation of Facts; to ensure petitioner worked both Mine A and Mine B. Referring to the escrow account, the agreement stated "should contractor (petitioner) perform each and every covenant, term and condition of this agreement then and in that event the escrow money shall be delivered to contractor (petitioner)."
6. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
7. The evidence shows that petitioner was paid the price fixed in the mining agreement of $34 per ton for 24 of the 28 weeks he mined coal, and that petitioner received that price for more than 93 percent of the coal he mined. The price paid to petitioner did vary the final four weeks he mined coal.↩