CHARLES P. MULLINS AND PALACE MULLINS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MORRISON MULLINS AND JUANITA MULLINS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 92487, 92488. Filed July 17, 1967.

*Carl F. Bauersfeld* and *Robert Ash*, for the petitioners.
*Jack D. Yarbrough* and *Vallie C. Brooks*, for the respondent.

DAWSON, *Judge:* In these consolidated proceedings the respondent determined the following income tax deficiencies and additions to tax against the petitioners:

| Petitioners | Docket No. | Year | Deficiency | Additions to tax | |
|---|---|---|---|---|---|
| | | | | Sec. 6651(a), I.R.C. 1954 | Sec. 6654, I.R.C. 1954 |
| Charles P. and Palace Mullins | 92487 | 1957 | $368.85 | | |
| | | 1958 | 578.42 | $28.92 | |
| | | 1959 | 2,843.53 | | $36.90 |
| Morrison and Juanita Mullins | 92488 | 1957 | 650.98 | | 8.13 |
| | | 1958 | 409.63 | 20.48 | 9.89 |
| | | 1959 | 2,915.53 | | 40.61 |

Some issues have been agreed to by the parties. The only issue for decision is whether the Mullins Coal Co., of which the petitioners were partners, had an economic interest in the coal in place under three leases so as to be entitled to a deduction for percentage depletion. The parties have agreed that our decision with respect to this issue will be determinative of the additions to tax under sections 6651(a) and 6654.

FINDINGS OF FACT

The parties have stipulated some of the facts. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Charles P. and Palace Mullins are husband and wife whose legal residence at the time their petition was filed herein was Clintwood, Va. For the years 1957, 1958, and 1959 they filed their joint Federal income tax returns with the district director of internal revenue in Richmond, Va.

Morrison and Juanita Mullins are husband and wife whose legal residence at the time their petition was filed herein was also Clintwood, Va. For the years 1957, 1958, and 1959 they filed their joint Federal income tax returns with the district director of internal revenue in Richmond, Va.

During the years 1957, 1958, and 1959, Charles P. Mullins and Morrison Mullins (hereinafter called Charles and Morrison individually or petitioners collectively) operated as equal partners a partnership known as the Mullins Coal Co. (hereinafter called the partnership) in Pound, Va. For each of the years in question, the partnership filed a partnership return with the district director of internal revenue in Richmond, Va.

For each of the years 1957, 1958, and 1959, the petitioners and the partnership reported their income for Federal income tax purposes on a cash basis.

During the years here involved, the partnership was engaged in the drift mining of coal under leases from the Virginia Iron, Coal & Coke Co. (hereinafter called V.I.C.) of Roanoke, Va. Drift mining is an underground mining operation in which a horizontal coal seam is reached by clearing away a part of the mountainside with a bulldozer. Two parallel tunnels are made into the coal seam, one for ventilation and the other for working space and the removal of coal. The coal is removed as the drift mine is driven into the mountain following the seam of coal. In drift mining the roof of the mine is supported by leaving pillars of coal in place and erecting wood supports at about 18-inch intervals, together with roof bolts.

The partnership entered into an oral lease with V.I.C. in 1957 whereby the partnership was granted the right to mine approximately 30 to 40 acres of coal in the Blair seam of coal in Wise County, Va. This oral lease was to remain in effect until all the coal in the area was mined or until it was no longer economically feasible for the partnership to mine it, and V.I.C. was to receive a royalty of 27 cents per ton for all coal produced under the lease. There was no mention of the party to whom the partnership had to sell the coal.

The partnership mined coal in the Blair seam during 1957 and most of 1958. It mined 12 to 15 acres of coal there before adverse mining conditions, namely, water and a bad roof, made mining both dangerous and unprofitable. The partnership then terminated its mining operations in the Blair seam. While V.I.C. encouraged the partnership to continue mining in this area, its engineers confirmed petitioners' opinion that mining the Blair seam was an unprofitable operation. Therefore, it made no effort to prevent the partnership from terminating the lease.

From approximately August 20, 1958, to the end of 1959, the partnership also produced coal mined under a written lease with V.I.C. covering a seam of coal known as the Bolling seam. This lease is set forth below in its entirety:

THIS COAL LEASE, made this the 20 day of August, 1958, between VIRGINIA IRON, COAL & COKE COMPANY, hereinafter called the LESSOR, first party, and Charles P. Mullins & Morrison Mullins, hereinafter called the LESSEE, second party,

WITNESSETH

That for and in consideration of the payments to be made by the Lessee to the Lessor as hereinafter provided, and of the covenants and conditions to be performed, the Lessor doth, by these presents, lease and let unto the Lessee, subject to all of the terms hereof, so much of what is known as the Bolling seam of coal in, under and upon the Lessor's James Cantrell tract of coal on the waters of

574

Meade Fork of Pound River in Wise County, Virginia, the area leased and the exterior lines thereof to be such as the Lessor's engineers may from time to time in their sole judgment assign to said Lessee, which area may be enlarged and/or decreased from time to time, together with such mining rights and privileges only for the mining and removal of the coal as are now vested in the Lessor by its title papers of record in said county.

Subject to all of the terms hereof, this lease is to continue in force until all the merchantable and mineable coal is mined and removed from the area assigned to the Lessee unless sooner terminated as herein provided. In event the Lessee concludes that he cannot operate the property profitably he has the right to terminate this lease upon 60 days written notice.

## THE LESSEE COVENANTS AS FOLLOWS

(1) To be careful in the use of fire in or near the woodlands, drifts, coal openings, slate dumps and improvements within or near the leased premises, and especially to so handle and dispose of waste from the mines as not to expose the coal seams to fire damages in event the slate and waste dumps shall now or later become ignited. Should fire threaten at any time the Lessee shall promptly take steps to combat the same and notify the Lessor or its duly authorized agents;

(2) To guard and protect from injury or trespass all openings made upon the leased premises during the life of this lease whether or not in actual operation, and generally to so handle the leased premises during the term hereof as to safeguard the interests of all concerned;

(3) To drive all main entries, rooms and other parts of the mine in a workmanlike manner according to the rules of good and customary mining, and strictly in keeping with the requirements of the Lessor's mining engineers, it being understood that the Lessor, at its election, will do or have done by its engineering department such mine engineering and such mine mapping hereunder as it may consider necessary for the proper development of the mine covered by this lease, including the giving of measurements and directions for the turning of rooms, entries, headings, etc., and the placing of centres therein;

(4) To keep accurate accounts and records of all coal produced upon or removed from said premises and to afford the Lessor or its agents access to such accounts and records whenever so requested;

(5) To pay Lessor for all coal produced upon or removed from said premises at the rate of 27 ¢ cents per ton for each and every ton of two thousand (2000) pounds thereof so produced and removed—according to actual weights—and all statements of the tonnage rendered Lessor to be verified by affidavit of the Lessee, all royalties to be paid either to the Lessor or its duly authorized agents not later than the fifteenth of each month for all coal mined during the preceding month;

(6) To operate leased premises with diligence and as continuously as market and other conditions may reasonably justify, allowance being made for interruptions by strikes, lockouts and other hindrances ordinarily regarded as beyond the control of the Lessee;

(7) The Lessee shall so conduct his operation hereunder as not to violate any rights of lateral or subjacent support of the surface belonging to persons other than the parties hereto, and to mine said coal and carry on all incidental work in all respects at the Lessee's own cost, the Lessor to be in no wise liable to any employees of the Lessee, nor any other person or persons, nor for damage resulting from the Lessee's operations, directly or indirectly, on or off of the leased premises, to persons or property, it being fully understood that the Lessor has and retains no control, supervision or authority over the Lessee's employees or

other persons, and the Lessee shall and does assume all responsibility and agrees to carry adequate Workmen's Compensation Insurance, and if there shall arise any question of damage to the surface of the lands affected by this lease, which may not be owned by the Lessor, or pertaining to any other interest or estate, in such case the Lessee hereunder shall and does assume all responsibility therefor without claim upon the Lessor except for its assistance and support in the proper defense of all mining rights covered by its title, the Lessee bearing all costs and expense, legal and otherwise connected therewith;

(8) To protect the mines and entries, haulways, rooms and working places in the mines by sufficient and necessary timbering; no pillars to be removed by the Lessee without the written permission of the Lessor first had, but in event the Lessor grants permission to remove pillars from the mine, this is not to be done except under plans furnished by the Lessor's engineers:

(9) To pay all local and state taxes lawfully assessed during the life of this lease upon or against, First, the Lessee's plant and improvements, machinery, tools, etc., and Second, the land embraced within the limits hereof. The said land is carried on the land books in the name of the Lessor and the taxes in the first instance will be paid by the Lessor, who as promptly as may be thereafter will bill on the Lessee for reimbursement. The Lessee hereby agrees to promptly make settlement with the Lessor for any and all taxes paid as aforesaid by it.

At the election of the Lessor and notwithstanding anything to the contrary contained herein, the said Lessor reserves the right by serving a 60 days notice upon the Lessee to unconditionally cancel this lease for reasons of its own that in its judgment may warrant that course; and in such event this lease shall stand absolutely and incontrovertibly terminated and the Lessee, on notice either of termination or forfeiture, hereby agrees to promptly vacate the leased premises, and in event he shall fail to do so, hereby authorizes the Lessor to enter upon and take possession thereof without resort to any legal process whatsoever.

But the Lessee, if in no wise in default hereunder, upon the termination of this lease may remove from the premises owned by the Lessor any and all improvements placed thereon by him, except the underground timbers and supports, provided this be done within 60 days from such termination, but if in default such improvements are to pass to and become the absolute property of the Lessor, free from any claim of said Lessee.

This agreement shall not be assigned, transferred or sublet without the written consent of the Lessor.

This instrument is executed in duplicate, each party receiving a copy hereof, and it is the sole agreement between the parties.

Witness the Following Signatures and Seals:

VIRGINIA IRON, COAL & COKE CO.

By (S) CARL W. HAMILTON,

*Vice President*

(S) CHARLES P. MULLINS [SEAL]

(S) MORRISON MULLINS [SEAL]

From approximately May 1, 1959, to December 31, 1959, the partnership also produced coal under a written lease with V.I.C. covering a seam known as the Clintwood seam. This lease was with Charles as lessee; however, he assigned it to the partnership and the partnership operated the property. This lease reads as follows:

THIS COAL LEASE, made this the 1st day of May, 1959 between VIRGINIA IRON, COAL & COKE COMPANY, hereinafter called the Lessor, first party, and

## 576

CHARLES P. MULLINS, Pound, Virginia, hereinafter called the LESSEE, second party,

### WITNESSETH

That for and in consideration of the payments to be made by the Lessee to the Lessor as hereinafter provided, and of the covenants and conditions to be performed, the Lessor doth, by these presents, lease and let unto the Lessee, subject to all of the terms hereof, about ten (10) acres of what is known as the Clintwood seam of coal in, under and upon the Lessor's James Cantrell tract of coal on the waters of Meade Fork Creek in Wise County, Virginia, the area leased and the exterior lines thereof appears on a mine map made by the Lessor's engineers, which area may be enlarged from time to time, together with such mining rights and privileges only for the mining and removal of the coal as are now vested in the Lessor by its title papers of record in said county.

Subject to all of the terms hereof, this lease is to continue in force for a period of two years from the date hereof, or until all the merchantable and mineable coal is mined and removed from the area assigned to the Lessee unless sooner terminated as herein provided. In event the Lessee concludes that he cannot operate the property profitably he has the right to terminate this lease upon thirty (30) days written notice.

### THE LESSEE COVENANTS AS FOLLOWS

[Paragraphs (1) through (9) are identical to paragraphs (1) through (9) of the Bolling lease and thus are not set out.]

At the election of the Lessor and notwithstanding anything to the contrary contained herein, after the initial term hereof, the said Lessor reserves the right by serving a thirty (30) days notice upon the Lessee to unconditionally cancel this lease for reasons of its own that in its judgment may warrant that course; and in such event this lease shall stand absolutely and incontrovertibly terminated and the Lessee, on notice either of termination or forfeiture, hereby agrees to promptly vacate the leased premises, and in event he shall fail to do so, hereby authorizes the Lessor to enter upon and take possession thereof without resort to any legal process whatsoever.

But the Lessee, if in no wise in default hereunder, upon the termination of this lease may remove from the premises owned by the Lessor any and all improvements placed thereon by him, except the underground timbers and supports, provided this be done within thirty (30) days from such termination, but if in default such improvements are to pass to and become the absolute property of the Lessor, free from any claim of said Lessee.

This agreement shall not be assigned, transferred or sublet without the written consent of the Lessor.

This instrument is executed in duplicate, each party receiving a copy hereof, and it is the sole agreement between the parties.

WITNESS THE FOLLOWING SIGNATURES AND SEALS:

VIRGINIA IRON, COAL & COKE CO.

By (S) CARL W. HAMILTON

(S) CHARLES P. MULLINS [SEAL]

During the years in issue, V.I.C. was a medium-sized coal company engaged both in the business of purchasing and selling coal and of leasing its real estate holdings. Although it owned large tracts of land suitable to mining, V.I.C. leased its property to small operators like

petitioners rather than mine its own coal because the underlying seams were not large enough to justify the investment of a large mine. The Blair, Bolling, and Clintwood seams fell into this category. V.I.C. would purchase its coal from the small operators at prevailing market prices and then sell the coal at current retail prices. Because of the close proximity of V.I.C.'s tipple, processing, and loading facilities, its lessees often found it less economical to haul their coal to any other coal company interested in purchasing the coal at prevailing market prices.

The partnership sold most of the coal it mined during the years 1957 through 1959 to V.I.C. However, there was no requirement under the leases that such sales be made to V.I.C. and some of the coal mined during the years 1957 and 1959 was sold to Cumberland Collieries, Inc. (hereinafter called Cumberland). Most sales were to V.I.C. because they involved less transportation costs and resulted in a greater profit to the partnership. All sales were at prevailing market prices. The sales to Cumberland occurred when all of V.I.C.'s coal cars for that day were loaded and no more were available. The following schedule shows the purchaser, number of tons sold, the royalty paid, and the gross sales of the partnership:

| | Tons mined and sold | Royalty paid | Gross sales |
|---|---|---|---|
| *Taxable year 1957* | | | |
| Blair seam | | | |
|   Sold to V.I.C. | 17,088.15 | $4,613.78 | $74,632.81 |
|   Sold to Cumberland Collieries, Inc. | 258.45 | 78.41 | 1,038.67 |
|     Totals | 17,346.60 | 4,692.19 | 75,671.48 |
| *Taxable year 1958* | | | |
| Blair seam | | | |
|   Sold to V.I.C. | 12,117.25 | 3,271.67 | 47,899.78 |
| Bolling seam | | | |
|   Sold to V.I.C. | 10,951.00 | 2,956.76 | 33,948.08 |
|     Totals | 23,068.25 | 6,228.43 | 81,847.86 |
| *Taxable year 1959* | | | |
| Clintwood seam | | | |
|   Sold to V.I.C. | 9,697.80 | 2,618.42 | 31,802.10 |
| Bolling seam | | | |
|   Sold to V.I.C. | 67,159.95 | 18,110.56 | 207,867.01 |
|   Sold to Cumberland Collieries, Inc. | 2,768.85 | 747.59 | 8,860.32 |
|     Subtotal | 69,928.80 | 18,858.15 | 216,727.33 |
|     Totals | 79,626.60 | 21,476.57 | 248,529.43 |

In conducting its mining operations under the three leases, the partnership incurred expenses for opening and operating the mines, in extracting the coal, and in building roads, power lines, and bins to store the coal. These partnership expenditures were either depreciated or charged off as business expenses. The partnership also paid the surface landowner the sums of $1,157.07 and $4,451.66 in the years 1958

and 1959, respectively, for damages and the right to transport its coal over the surface of his property. This is known as wheelage and was deducted by the partnership in those years. Since V.I.C. owned the land containing the Blair seam, the partnership had no wheelage expenses with regard to coal mined there.

During the years in question, the petitioners claimed the following deductions for royalty and percentage depletion on their partnership returns:

|  | 1957 | 1958 | 1959 |
|---|---|---|---|
| Coal sales | $75,671.48 | $81,847.86 | $248,529.43 |
| Royalty paid | 4,692.19 | 6,228.43 | 21,476.57 |
| Amount subject to depletion | 70,979.29 | 75,619.43 | 227,052.86 |
| Depletion at 10 percent | 7,097.92 | 7,561.94 | 22,705.28 |

The partnership was paid twice each month by V.I.C. for the coal sold and delivered to V.I.C.'s tipple. The 27-cent-a-ton royalty fee payable to V.I.C. by the partnership for each ton of coal mined was collected by V.I.C. by deducting it from the amount payable to the partnership for coal purchases. Under its leases with V.I.C. the partnership was not required to pay a minimum royalty during any specific period.

During the years 1957, 1958, and 1959, V.I.C. did not engage in the business of mining coal. It claimed cost depletion on the royalty payments it received from the partnership. It did not claim percentage depletion on the coal mined or produced by the partnership during the years here involved.

In his notices of deficiencies the respondent disallowed the claimed deductions for percentage depletion with the following explanation:

The deduction claimed in the amount of [$7,097.92] for percentage depletion has been disallowed since it has not been established that the partnership owned an economic interest in the coal in place.

OPINION

Section 611 of the Internal Revenue Code of 1954 [1] provides that in the case of mines there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion, such allowance to be made under the regulations prescribed by the Secretary or his delegate. Under section 611(b)(1) this deduction is to be equitably apportioned between the lessor and lessee where there is a lease. Section 613 provides that the percentage depletion for coal shall be 10 percent of the gross income from the property, excluding an amount equal to rent or royalties paid, such allowance not to exceed 50 percent

---

[1] All subsequent references are to the Internal Revenue Code of 1954 and the regulations promulgated thereunder.

of the taxpayer's taxable income from the property. "Gross income from the property" is defined as the gross income from mining.

A taxpayer must have an "economic interest" in the coal in place to be entitled to an allowance for depletion. Section 1.611–1(b) (1), Income Tax Regs., using language which originated with the Supreme Court in *Palmer* v. *Bender*, 287 U.S. 551 (1933), provides that an "economic interest" is possessed by any taxpayer who has acquired by investment any interest in mineral in place and secures, by any form of legal relationship, income derived from the extraction of the mineral, to which he must look for a return of his capital. But this does not include a person who possesses a mere economic or pecuniary advantage from production.

Applying the conditions of the regulation, petitioners contend that under the leases to the Blair, Bolling, and Clintwood seams the partnership had an economic interest in the coal in place and was entitled to depletion deductions on the coal it mined. They point out that V.I.C. did not claim percentage depletion on coal mined by the partnership and argue that this reflects an intention and belief by the parties that the partnership received an interest in the coal in place. They would distinguish *Parsons* v. *Smith*, 359 U.S. 215 (1959), and *Paragon Jewel Coal Co.* v. *Commissioner*, 380 U.S. 624 (1965), two recent Supreme Court cases which disallowed depletion deductions taken by the lessee or "contract miner" of the coal.

Respondent, on the other hand, contends that the two Supreme Court cases are controlling. He maintains that the petitioners did not possess an economic interest in the coal in place, but merely had an economic or pecuniary advantage derived from production. He argues that the petitioners' interest under each of the three leases was not sufficient to entitle them to a percentage depletion allowance.

We agree with the petitioners that they did have an economic interest qualifying for a depletion allowance under the Blair and Clintwood leases. However, we agree with the respondent as to the Bolling lease.

### Blair and Clintwood Leases

It is true that a lessee's investment in depreciable equipment plus the deductible expenses of opening and operating a mine are not sufficient to give a lessee an economic interest in the coal in place. See *Parsons* v. *Smith*, supra at 223–224; *United States* v. *Stallard*, 273 F. 2d 847 (C.A. 4, 1959) ; and *William M. Legg*, 39 T.C. 30 (1962). And, although the partnership paid a bona fide royalty of 27 cents on each ton of coal mined or produced, no court has placed reliance on royalty payments as a factor sufficient in itself to give a lessee a depletable interest in minerals in place. Nevertheless, applying the definition of

an economic interest as set forth in section 1.611–1(b)(1) of the regulations, it is our view that the partnership acquired by investment an interest in the coal in place under the Blair and Clintwood leases. The partnership had the right to mine the coal to exhaustion under the oral lease pertaining to the Blair seam. There was no mention of V.I.C.'s right to terminate, and it is inconceivable that V.I.C. could have terminated without showing cause. Indeed, a former V.I.C. vice president testified that the company had no intention of terminating, and had never terminated, similar leases with small coal operators. In addition to the obligation of paying a royalty on each ton of coal mined, the partnership also had an obligation to mine the Blair seam either to exhaustion or until it was no longer economically profitable. These facts establish that V.I.C. surrendered part of its capital interest in the coal in place since it no longer maintained complete control over the coal, and that the partnership had a capital investment in such coal because it was obligated to continue mining it and to pay a royalty for that privilege.

Similarly, under the Clintwood lease, the partnership had the right to mine the Clintwood seam for 2 years from the date the lease became effective and the years here involved fell within that period. This was sufficient time for the lessee-partnership to extract a substantial portion of the coal from that seam. See G.C.M. 26290, 1950–1 C.B. 42, 45. The partnership had an obligation to mine the seam for 2 years or until exhaustion or until it was no longer profitable, whichever occurred first, as well as make a royalty payment on each ton of coal mined. These rights and obligations gave the partnership a sufficient capital interest in the coal in place in the Clintwood seam to entitle the petitioners to a depletion allowance under section 611.

The parties agree that the Blair and Clintwood leases are valid and binding upon the parties. Therefore, it is clear that petitioner's right to mine is secured by a "form of legal relationship" sufficient to meet that part of the "economic interest" definition contained in the regulations.

The final requirement for having an "economic interest" is that the taxpayer must secure income derived from the extraction of the mineral to which he must look for a return of his capital. The petitioners' activities under the Blair and Clintwood leases meet this requirement.

Under both of these leases there is no mention of either the party to whom or the price at which the partnership was to sell the coal it mined. While the partnership could make a greater profit through sales to V.I.C. since transportation costs were less, it also sold coal to Cumberland on occasion. Moreover, the evidence shows that the coal was sold at the current market price. Thus the petitioners could realize income only by extracting the coal and finding a willing purchaser for

it. There was no agreement, either express or implied, under which the partnership looked to V.I.C. for a fixed sales price of its coal or under which it had to sell its coal to V.I.C.

Respondent relies only on *Parsons* v. *Smith, supra; Paragon Jewel Coal Co.* v. *Commissioner, supra;* and *Lesta Ramey,* 47 T.C. 363 (1967), on appeal (C.A. 6), on the ground that those cases are indistinguishable from the facts of this case. In *Parsons,* the Supreme Court listed seven factors relevant to a consideration of whether the coal operators had any capital investment or economic interest in the coal in place. These factors are:

(1) that petitioners' investments were in their equipment, all of which was movable—not in the coal in place; (2) that their investments, in equipment were recoverable through depreciation—not depletion; (3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to petitioners any capital interest in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that petitioners could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that petitioners were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered, which was, as stated in *Huss* [255 F.2d 600], agreed to be in "full compensation for the full performance of all work and for the furnishing of all [labor] and equipment required for the work"; and (7) that petitioners, thus, agreed to look only to the landowners for all sums to become due them under their contracts.

Close examination of these factors convinces us that the petitioners fall outside of their scope. Here the petitioners had an investment in more than their depreciable equipment. The Blair and Clintwood leases were not terminable on short notice. V.I.C. surrendered all capital interest in the Blair seam with the exception of royalty payments unless showing cause to terminate and all rights in the Clintwood seam coal in place except royalty payments until the 2 year period expired. The coal, after it was mined, belonged to the partnership. The partnership could sell its coal to any party and for the best price available; hence it looked to others beside V.I.C. for sums owed.

Furthermore, we regard the *Parsons, Paragon,* and *Ramey* cases as factually distinguishable from this case. In each of those cases the lessee was to sell all usable coal to the lessor and at a price fixed by the lease or contract. By contrast, the partnership here could and did sell the coal it mined to any party offering it the most profitable price. Unlike the leases in the *Parsons* and *Ramey* cases which permitted the lessor to terminate on short notice if he was not satisfied with the coal produced, the leases pertaining to the Blair and Clintwood seams gave the partnership an absolute right to mine those seams for a fixed period or to exhaustion. Unlike the *Parsons* and *Paragon*

cases where there was no royalty payment and the *Ramey* case where this Court found that the so-called royalty payment was in reality a reduction in the price paid for the coal by the lessor, the partnership here made a royalty payment of 27 cents per ton to V.I.C. on all the coal it mined under the two leases, regardless of who purchased the coal. These distinguishing factors persuade us that, unlike the *Parsons*, *Paragon*, and *Ramey* cases where the lessees were found to be contract miners under the control of their lessors, the partnership in this case was an independent small operator which had complete control over the mining production and sales of coal relating to the Blair and Clintwood seams. In our opinion the petitioners have met the definition of an "economic interest" as set out in the regulations and they have successfully distinguished themselves from the contract miners in the *Parsons*, *Paragon*, and *Ramey* cases. Therefore, we hold that the petitioners' interests in the Blair and Clintwood seams qualify as depletable economic interests under section 611, thus entitling them to the depletion deductions claimed.

### Bolling Lease

While the Bolling lease is like the Blair and Clintwood leases in all other material respects, it contains the provision that:

> At the election of the Lessor and notwithstanding anything to the contrary contained herein, the said Lessor reserves the right by serving a 60 days notice upon the Lessee to unconditionally cancel his lease for reasons of its own that in its judgment may warrant that course; * * *

With regard to the Bolling seam, V.I.C. reserved the unconditional right to terminate its lease with the partnership without cause upon 60 days' notice. This provision is clear and unambiguous on its face. Consequently, parol evidence in the form of testimony by Charles and a former V.I.C. vice president as to the meaning of that provision is irrelevant. See *United States* v. *Stallard*, *supra* at 850, and *J. Shelton Bolling*, 37 T.C. 754, 764 (1962). Moreover the parties have not presented, nor can we find, any State law holding that such a provision is not enforceable by the lessor. Cf *Lark L. Washburn*, 44 T.C. 217, 224–225 (1965). V.I.C. therefore had the legal right to terminate the lease at will upon giving specific notice to the partnership.

Our previous discussion of the Blair and Clintwood leases, in the light of the seven factors set forth in *Parsons* as to the presence of an economic interest in the coal in place, is also relevant, in part, to the Bolling lease. The petitioners had an investment in more than their depreciable equipment in that seam since they paid a bona fide royalty to V.I.C. for each ton of coal mined. The coal belonged to the partnership after it was mined. The partnership could sell the coal to any party and for the best price available; thus it looked to others besides V.I.C.

for sums due to it. The petitioners fail to meet only the third and fourth factors, viz, that the contracts (leases) were completely terminable without cause on short notice and, as a result, the lessor did not surrender its capital interest in the coal in place.

While in both *Parsons* and *Paragon* the Supreme Court did not say which of the seven factors listed by it were absolutely essential in determining that the contractors had no economic interest, there is little doubt that in order to have a property right the contract lessee must have an interest which cannot be terminated at the will of the lessor or on short notice. This Court and the Court of Appeals for the Fourth Circuit have repeatedly held that the right to mine to exhaustion or for a specific period is the critical factor in determining whether a lessee has obtained a depletable economic interest in the mineral in place. See *United States* v. *Stallard, supra* at 849–850; *McCall* v. *Commissioner*, 312 F. 2d 699, 705 (C.A. 4, 1963), affirming 37 T.C. 674 (1962); *Stilwell* v. *United States*, 250 F. 2d 736, 739 (C.A. 4, 1957); and *William M. Legg, supra* at 39. In our view a lessee cannot acquire by investment an interest in the coal in place when any interest he has in the coal is terminable by the lessor at will or on short notice, particularly where, as in this situation, the lessor in fact purchased most of the coal. Moreover, the petitioners, as lessee, also had a right of termination on 60 days' notice. *Paragon Jewel Coal Co.* v. *Commissioner, supra* at 630. The royalty paid by the partnership was for the coal once it was actually mined or produced, and it expensed or depreciated all of its other costs. The partnership therefore had no investment in the *coal still in place* justifying a depletion allowance. Only V.I.C., which in effect still had complete control over the coal in place through its right to terminate the Bolling lease without showing cause, possessed the qualifying depletable interest within the intendment of section 611. Accordingly, the depletion deduction claimed by the petitioners for the coal mined in the Bolling seam must be denied.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

DRENNEN, *J.*, dissenting: I agree with the majority that petitioners are entitled to a deduction for depletion with respect to the coal mined from the Blair and Clintwood leases, but I respectfully disagree with the conclusion that petitioners are not entitled to a deduction for depletion with respect to the coal mined from the Bolling lease.

The issue between us is definitely pointed up by the statement in the majority opinion, "In our view a lessee cannot acquire by investment an interest in the coal in place when any interest he has in the coal is terminable by the lessor at will or on short notice * * *." It is

clear from the majority opinion that in their view petitioners had all the same requisites for the allowance of a depletion deduction under the Bolling lease as they had under the Blair and Clintwood leases except for the termination clause in the Bolling lease. I agree that the presence of a clause permitting the lessor to terminate the lease without cause on short notice is an important factor to be considered in determining who has the requisite economic interest in the coal under a lease or contract but I do not think it is conclusive, as does the majority.[1] In my opinion we should look to the overall purpose of the depletion statute, and all the circumstances of the particular transaction, to determine how much weight to give to the termination clause in determining who had the economic interest in the mineral deposit.

The percentage depletion deduction is geared primarily to production; it is allowable as a percentage of the gross income from the property, sec. 613(a), I.R.C. 1954, which is defined in section 613(c) (except in the case of oil and gas) as "the gross income from mining." Under the Bolling lease, as under the other two leases, petitioners were the only persons who could have any "gross income from mining" the coal that they mined under the lease, except possibly for the royalty paid to the lessor (against which the depletion deduction is not allowed under section 631(c)—see *Paragon Jewel Coal Co.* v. *Commissioner*, 380 U.S. 633). Petitioners were not mining the coal *for* the lessor, as was the situation in the *Paragon* case and many of the contract miner cases which have given rise to so much litigation in this area of tax law in recent years. Under the Bolling lease petitioners were entitled to mine all the merchantable and minable coal under the leased area (unless and until the lease is terminated by the lessor), they were obligated to pay all the costs of mining plus a tonnage royalty on the coal mined, they had complete title to the coal once it was removed, and they were entitled to sell it to whomever they wanted at whatever price they could sell it for. In other words they were required to look to the extraction of the coal and the sale thereof for a return of their investment and their profit; they were not required to deliver all the coal mined to the lessor for a fixed price or fee per ton.

If the only question here was whether the lessor or the lessees were entitled to the depletion deduction, I would have no hesitancy in saying that the lessees were entitled to it. This is because I think the lessor surrendered all or a part of his economic interest in the coal under the Bolling tract to the lessee while the lease was in effect; and we are concerned with depletion on coal that was mined while the lease was effective.

But there is no question that the case law and the Commissioner's regulations have engrafted on the requirements of the law that to be en-

---

[1] Which admittedly finds some support in some of the cases decided by this Court and the Court of Appeals for the Fourth Circuit, cited in the majority opinion.

titled to a deduction for depletion the taxpayer must have an economic interest in the mineral deposits. I agree with the majority that the petitioners had an economic interest in the coal underlying the Blair and Clintwood leases, for the reasons stated in the opinion. I cannot agree that they had any less economic interest in the coal underlying the Bolling lease; the only difference was that their interest under the Bolling lease was subject to divestment if the lessor exercised his right to terminate. Until such time as the lessor exercised that right, in my opinion petitioners had such an economic interest in the coal deposit that would support the depletion deduction. If the lessor exercised his right to terminate, the entire economic interest would then revert to the lessor. But we are not here concerned with coal mined after that time.

This suggested shifting of the economic interest in a mineral deposit is not unusual. Under the pertinent regulation it occurs any time a taxpayer acquires by investment any interest in the mineral in place and secures, by any form of legal relationship, income derived from the extraction of the mineral, to which he must look for a return of his capital. Indeed the conclusion of the majority must recognize the possibility of such a shift in economic interest under the Clintwood lease, because after the original 2-year term thereof the lessor has the absolute right to terminate the lease on short notice without cause and, according to the theory of the majority, the economic interest in the coal in the Clintwood lease, which had theretofore rested in the lessee, would revert to the lessor.

Where, because of the uncertain terms of a mineral lease or contract, it is difficult to determine whether the lessee or contractor is simply mining the coal for the lessor for a fee or fixed price, or whether the lessor has actually surrendered his economic interest in the coal to the lessee, the presence of a short termination clause, considered along with the other terms of the agreement, would usually be entitled to considerable weight. But I do not believe it should be a conclusive factor in determining that the petitioners here, who obviously had an economic interest in the coal deposit and had to look to the extraction and sale of that coal for their profit, were not entitled to the depletion deduction solely because of the termination clause in the Bolling lease.

---

TIETJENS, *J.*, dissenting: In my opinion the relationship of the petitioners to the coal which was mined differs so little from that dealt with in *Lesta Ramey*, 47 T.C. 363, that I would hold they had no economic interest which would entitle them to depletion under any of the leases.