*Decision will be entered for the petitioners.*

LELAND ADKINS AND BERNICE ADKINS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 691–66, 692–66, 828–66, 833–66, 2829–66, 2830–66. Filed March 12, 1969.

---

[23] We do not pass upon the question whether the new version of the regulation has retroactive effect.

[1] Cases of the following petitioners are consolidated herewith: Buhl Adkins and Norma Jean Adkins, docket No. 692–66; Kenneth G. Baker and Ethel Baker, docket No. 828–66; Bobby D. Mullens and Elizabeth F. Mullens, docket No. 833–66; Carl M. McCombs and Phala McCombs, docket No. 2829–66; and Francis F. Nutter and Monta Nutter, docket No. 2830–66.

*Carl J. Nutter* and *Pat R. Hamilton*, for the petitioners.
*Rodney G. Haworth*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioners' Federal income tax for the calendar years 1961, 1962, and 1963 as follows:

| Petitioners and docket No. | 1961 | 1962 | 1963 |
|---|---|---|---|
| Leland Adkins and Bernice Adkins, 691-66 | $3,505.64 | $7,138.66 | $9,393.21 |
| Buhl Adkins and Norma Jean Adkins, 692-66 | 3,464.76 | 7,344.99 | 9,562.33 |
| Kenneth G. Baker and Ethel Baker, 828-66 | 2,130.72 | 3,159.36 | 4,949.20 |
| Bobby D. Mullens and Elizabeth Mullens, 833-66 | 1,130.75 | 1,696.93 | 2,676.11 |
| Carl M. McCombs and Phala McCombs, 2829-66 | | 39.04 | 6,263.85 |
| Francis F. Nutter and Monta Nutter, 2830-66 | | 107.10 | 6,768.93 |

Concessions have been made by all parties. The only issues remaining are:

(1) Whether petitioners had a sufficient economic interest in coal properties so as to entitle them to percentage depletion;

(2) Whether certain expenditures for mining equipment were currently deductible expenses, or were required to be capitalized.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference. Those facts necessary to the determination of the remaining issues are presented below.

### GENERAL FINDINGS OF FACT

Petitioners Leland and Bernice Adkins, husband and wife, resided in Summersville, W. Va., at the time their petition in the instant case was filed. Their joint Federal income tax returns for the calendar years 1961, 1962, and 1963 were filed with the district director of internal revenue for West Virginia.

Petitioners Buhl and Norma Jean Adkins, husband and wife, resided in Summersville, W. Va., at the time their petition in the instant case

was filed. Their joint Federal income tax returns for the calendar years 1961, 1962, and 1963 were filed with the district director of internal revenue for West Virginia.

Petitioners Kenneth G. and Ethel Baker, husband and wife, resided in Summersville, W. Va., at the time their petition in the instant case was filed. Their joint Federal income tax returns for the calendar years 1961, 1962, and 1963 were filed with the district director of internal revenue for West Virginia.

Petitioners Bobby D. and Elizabeth F. Mullens, husband and wife, resided in Summersville, W. Va., at the time their petition in the instant case was filed. Their joint Federal income tax returns for the calendar years 1961, 1962, and 1963 were filed with the district director of internal revenue for West Virginia.

Petitioners Carl M. and Phala McCombs, husband and wife, resided in Leivasy, W. Va., at the time their petition in the instant case was filed. Their joint Federal income tax returns for the calendar years 1962 and 1963 were filed with the district director of internal revenue for West Virginia.

Petitioners Francis F. and Monta Nutter, husband and wife, resided in Leivasy, W. Va. Their joint Federal income tax returns for the calendar years 1962 and 1963 were filed with the district director of internal revenue for West Virginia.

Leland, Bernice, Buhl, and Norma Jean Adkins, at all relevant times were the sole shareholders in Adkins Bros. Coal Co., a West Virginia corporation, which company elected to be taxed as a "Small Business Corporation" for the years in issue under subchapter S of the Internal Revenue Code.[2] Kenneth Baker and Bobby Mullens were equal partners in the Big Fork Coal Co. during the years in issue. Carl McCombs and Francis Nutter were equal partners in McCombs & Nutter during the years in issue.

## Depletion Issue

On July 31, 1956, March 18, 1961, and October 1, 1961, Adkins Bros. Coal Co. (hereinafter sometimes referred to as Adkins Coal), Big Fork Coal Co. (hereinafter sometimes referred to as Big Fork), and McCombs & Nutter, respectively, entered into similar "Sublease and Sales Agreements" with subsidiaries of Maust Coal & Coke Corp. (hereinafter sometimes referred to as Maust) to mine coal on land Maust either owned or leased. The form of all three agreements was as follows:

---

[2] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

## SUBLEASE AND SALES AGREEMENT

THIS SUBLEASE made the _____ day of _____, 19___, between [1] _____, a corporation, Sublessor, and _____ Sublessee.

WITNESSETH: That in consideration of the promises and agreements herein contained to be faithfully kept and performed by the Sublessee, the Sublessor, subject to its lease with _____, subleases and sublets to the Sublessee all the mineable, merchantable coal, for deep mining only, in the _____ Seam in that part of its leases on _____ in _____ District, _____ County, West Virginia, described as follows:

The term of this sublease shall be for one (1) year from and after the date hereof, and thereafter from year to year until the exhaustion of said coal except that either party may terminate this lease at the end of any rental year by written notice delivered or mailed to the other thirty (30) days or more before the end of any rental year, but the term hereof shall be no longer than remaining term of Sublessor's lease.

The Sublessee promises and agrees to proceed immediately with the removal of said coal and to prosecute such operations diligently and continuously unless prevented by fire, flood, acts of God, strikes, railroad car shortages, lack of orders or other conditions beyond the control of the Sublessee and unless so prevented to produce at least _____ [2] tons per month, and to comply with all state and federal laws and regulations which apply.

The Sublessee may take from the premises such timbers as may be necessary for timbering his operations, but complying with requirements of Sublessor's lease. [3]

Sublessee promises and agrees to conduct his mining operations in accordance with accepted mining practices in the area and with original lease and with mining plans of Sublessor required by its lease and with a view to obtaining the maximum amount of recoverable coal.

All coal mined and removed hereunder shall be accurately weighed by an agent of the Sublessor on scales of the Sublessor on the premises, and the Sublessor promises to furnish a copy of such weights to any of the Sublessee's purchasers. On coal sold by Sublessee for processing through the Sublessor's tipple for railroad shipment and upon which it receives compensation for such service, the Sublessor will make no charge for royalty. On coal sold by Sublessee not to be processed through Sublessor's tipple, the Sublessor will make a charge for royalty and weighing and for any use proposed to be made of its roads and other facilities, the amount of which shall be fixed by mutual agreement, and in case of inability to agree the Sublessee may terminate this Sublease by a 30-day written notice.

The Sublessor's and/or the Lessor's agent and engineers may enter into all mines and operations of the Sublessee at any time to check compliance herewith.

The Sublessee promises and agrees to save the Sublessor harmless from any liability for damages resulting from Sublessee's operations hereunder. Sublessee further agrees to make all required government reports and to report and pay all taxes applicable to his operations hereunder, including the W. Va. Business and Occupation (Gross Sales) Tax on such coal produced and sold, as a producer of natural resources.

---

[1] The sublessor was either Cherry River Coal & Coke Co. or Gauley Eagle Coal & Coke Co., both wholly owned by Maust Coal at all relevant times.

[2] Adkins Coal, 100; Big Fork, 200; and McCombs and Nutter, 400.

[3] This provision is crossed out on the Adkins Coal Co. lease.

In case of any breach by the Sublessee of any promise or agreement herein contained to be kept and performed by him, the Sublessor may terminate this lease by a 10-day written notice delivered to the Sublessee or mailed to him at his last known address.

All prior subleases and sales agreements between the parties hereto are hereby cancelled and released.

WITNESS THE following signatures and seals. _____

By: _____

Its: _____

_____ (seal)

On the same or the following day as the "Sublease-and-sales agreements" were entered into, the respective companies entered into similar "Coal Sales Agreements" with the Maust Coal & Coke Corp. The form of all three agreements, in important part, was as follows:

THIS COAL SALES AGREEMENT made the _____ day of _____, 19___, between, Seller, and MAUST COAL AND COKE CORPORATION, Buyer.

WITNESSETH: That the Seller promises and agrees to sell and the Buyer promises and agrees to buy the Seller's entire production of clean, merchantable marketable coal produced by the Seller from his coal operating sublease with _____, dated _____, 19___, located on _____, in _____ County, West Virginia, under the following terms and conditions:

1. All such coal shall be weighed by an agent of _____ on its scales and a copy of the weights furnished to the Buyer and Seller, and the coal shall be delivered by the Seller into bin or stockpile at tipple of _____ as may be required by that Company.

2. The Seller agrees to deliver and the Buyer agrees to accept not less than _____ tons per month, but delivery and/or acceptance, in whole or in part, shall be subject to fire, flood, strikes, acts of God, railroad car shortages, adverse market conditions, the ability of facilities of _____ to handle the coal, and other conditions beyond the control of the party affected.

3. The Buyer agrees to pay and the Seller to accept a price of $_____ per net ton of two thousand (2000) pounds of such coal so delivered, payments to be made on the 15th day of each calendar month for all such coal so delivered from the 25th day of the preceding month to the 10th day of the current month and on the last day of each calendar month for all such coal so delivered from the 10th day to the 25th day of the current month, provided, however, that in case of a substantial change in the general market price of such coal the above price shall be accordingly increased or decreased in a comparable ratio as may be fixed by mutual agreement between the parties hereto, and in case of failure so to agree either party may terminate this agreement by a thirty-day written notice delivered or mailed to the other.

4. The Buyer may relieve itself from the purchase of any or all coal hereunder by procuring another responsible purchaser willing to perform as herein required.

5. Any coal furnished which is not clean, merchantable and marketable may be rejected by the Buyer at any place where discovered, or if it be accepted by a subsequent purchaser subject to penalties such penalties shall be charged back to the Seller.

6. Any termination of the sublease aforesaid shall terminate this agreement. WITNESS THE following signatures and seals.

_____ (seal)

MAUST COAL & COKE CORP.

By: _____

Its: _____

Each agreement provided that the coal was to be delivered to the same subsidiary as entered into the respective "Sublease and Sales Agreements." The initial prices the sellers were to receive were: Adkins Coal, $3.60; Big Fork, $3.85; and McCombs & Nutter, $3.70 per net ton, and the minimum amounts of coal to be delivered were 200, 200, and 400 tons, respectively.

Pursuant to the above agreements Adkins Coal, Big Fork, and McCombs & Nutter (hereinafter sometimes collectively called the contractors) began mining operations. They bore all preparation and mining costs, which included opening the mines, building supporting structures such as fan houses, powder houses, transformers, and coal tipples (storage bins), and ventilation tunnels; shoring the roofs; wiring the tunnels; removing rock, water, and unmarketable coal; and both constructing and maintaining roads. Maust Coal's subsidiaries paid all real estate taxes, built and maintained some roads leading to their tipples, and paid royalties to owners of any land which Maust or its subsidiaries leased. If any attempts at mining were unsuccessful, the contractors (the respective petitioners) bore any losses incurred. Each unsuccessful attempt to open a mine shaft generally meant at least a $10,000 loss to the concerned contractor.

With the exception of coal used for the contractors' employees personal use, all coal which the contractors mined was delivered to Maust Coal's subsidiaries. Pursuant to the above agreements, the contractors made no royalty payments on coal processed through the sublessors' tipples. Fifty cents per ton was paid to the sublessors under the sublease-and-sales agreements for coal consumed by the contractors' employees, which coal however was de minimis, totaling only about 300 to 400 tons per year for each contractor.

During the years in issue Maust Coal's subsidiary, Cherry River Coal & Coke Co. (hereinafter sometimes called Cherry River) specified the areas within the respective leases which were to be mined and its engineers laid out the mining plans to be followed. It also handled all arrangements for selling coal delivered to the tipples.

During the years in issue, the price the contractors received for the coal fluctuated. As a rule, Cherry River set the price. It did not confer with the contractors before the price was raised, but did give

30 days' notice if it intended to decrease the price. Some price changes reflected changes in market prices, but all changes were not necessarily made for this reason. On at least one occasion, Cherry River rescinded a proposed price decrease when one of the contractors complained that it would not be able to earn a profit.

During the years in issue, there was no agreement between the parties to the contracts as to who would take percentage depletion. On its U.S. Small Business Corporation Return of Income for the fiscal years ending March 31, 1961, 1962, and 1963, Adkins Coal deducted percentage depletion based on the gross receipts from the above mining operations. On their U.S. Partnership Returns of Income, Big Fork and McCombs & Nutter also deducted percentage depletion on the same basis for the calendar years 1961 through 1963, and 1962 through 1963, respectively. In accordance with subchapter S and the partnership provisions of the Code, the respective petitioners in the instant case reflected the depletion deductions on their respective returns for the years in issue.

For the fiscal years ended March 31, 1962 and 1963, Maust Coal, on its consolidated returns, deducted percentage depletion based on its gross receipts from the coal delivered to it by Adkins Coal and Big Fork. No deduction was taken for the fiscal year ended March 31, 1961, because for that year it had no net income. Similarly, no depletion deduction was taken by Maust on receipts from coal delivered by McCombs & Nutter for the fiscal years ended March 31, 1962 and 1963, as there was no net income to Maust from the land which McCombs & Nutter mined.

In his statutory notices of deficiency, respondent determined that none of the contractors were entitled to deduct percentage depletion and consequently he increased petitioners' incomes to reflect these disallowances.

### ULTIMATE FINDING OF FACT

The Adkins Bros. Coal Co., the Big Fork Coal Co., and McCombs & Nutter did not possess "an economic interest in coal in place." Their interest amounted only to an "economic or pecuniary advantage derived from production," and thus they were not entitled to deduct percentage depletion.

### Supply Expense Issue

On November 1, 1962, Adkins Coal purchased certain mining equipment consisting of belts, chains, and conveyor pans. The equipment was movable and had an expected life of 4 to 5 years. The purpose for the purchase was to enable the company to go deeper into the mine in

order to reach more coal. The face line of the coal receded as coal was taken out, and the above equipment was needed to maintain the existing production. Installation of the equipment did not increase the value of the mine, nor did it decrease the cost of production. Its only purpose was to maintain a steady production flow.

In 1962, without benefit of the equipment for most of the year, Adkins Bros. Coal Co. mined a total of 89,273 tons during 254 days for an average of 351 tons per day. Total tonnage for 1963, after the equipment was installed, was 87,915 tons during 235 days for an average of 374 tons per day or an average increase of 23 tons per day over 1962.

On its U.S. Small Business Corporation Return of Income for the year ended March 31, 1963, Adkins Coal deducted the full $7,550 equipment cost as supplies expense and the deduction was reflected on the joint income tax returns for the calendar year 1963 filed by Leland and Bernice Adkins, and Buhl and Norma Jean Adkins.

In his statutory notices of deficiency addressed to the last above-mentioned petitioners respondent disallowed the deduction as reflected on the above returns as follows:

(3) It is determined that the amount of $7,550.00 claimed as supply expense for conveyor pans and chains represents capital expenditures recoverable through depreciation. Therefore, income is increased by said amount and depreciation allowed on same under item (2).

ULTIMATE FINDING OF FACT

Adkins Coal expenditures for the above equipment constituted ordinary and necessary business expenses.

OPINION

*Depletion Issue*

During the years in issue, Adkins Bros. Coal Co., the Big Fork Coal Co., and the McCombs & Nutter Coal Co. (the contractors) mined and sold coal under separate but similar lease-and-sales agreements. All three companies claimed percentage depletion on their respective returns and because all the companies were either partnerships or subchapter S corporations, these amounts were reflected on the individual income tax returns of the petitioners in the instant case.

Section 611 of the Internal Revenue Code provides that under the regulations prescribed by the Secretary or his delegate, a reasonable allowance for depletion is to be allowed in computing the taxable income derived from mines. Section 613 provides that the percentage depletion for coal is 10 percent of the gross income from the property,

excluding an amount equal to rent or royalties paid, such allowance not to exceed 50 percent of the taxpayer's taxable income from the property. The term "gross income from the property" is defined by section 613(c) as "the gross income from mining." (*Charles P. Mullins*, 48 T.C. 571, 579 (1967).)

Unlike cost depletion (sec. 612), percentage depletion is allowable whether or not the taxpayer has any remaining tax basis in the mineral. Under section 1.611–1(b)(1), Income Tax Regs., all that is required for a taxpayer to be eligible for percentage depletion is the ownership of an "economic interest" in the coal in place. Using the language of the Supreme Court in *Palmer* v. *Bender*, 287 U.S. 551 (1933), the regulation states that an "economic interest" is possessed by any taxpayer *who has acquired by investment any interest in mineral in place* and secures, by any form of legal relationship, income derived from the extraction of the mineral to which he must look for a return of his capital. But this does not include a person who possesses a mere economic or pecuniary advantage derived from production.

Whether an individual has an "economic interest" or possesses a mere economic or pecuniary advantage derived from production is ultimately a question of fact based on the totality of facts in each case. *Ramey* v. *Commissioner*, 398 F. 2d 478 (C.A. 6, 1968), affirming 47 T.C. 363 (1967).

In the instant case the contractors each entered into separate sublease and sales agreements with Maust Coal & Coke Corp. subsidiaries (hereinafter sometimes called the sublessors) and at approximately the same time entered into coal sales agreements with Maust. In relevant part, the sublease agreements each granted the respective contractors the right to mine all coal in a specified area through deep mining for a 1-year period and thereafter from year to year until exhaustion. In return the contractors agreed to mine a minimum of from 100 to 400 tons of coal each month.

All coal mined was required to be weighed by the sublessors. Where coal was processed through the sublessors' tipples and where the sublessors received compensation from the service, there was no royalty charge to the contractors. Coal which was not to be processed through the sublessors' tipples was to carry a royalty charge and a service charge, such charge to be determined by mutual agreement.

If no agreement as to the royalty was reached, the contractors, but not the sublessors, had the right to terminate the agreement on 30 days' written notice. No provision was made as to the sublessors' rights in such an event. If the contractors breached the agreements, the sublessors could terminate the leases upon 10 days' written notice. Either party could terminate the agreement on written notice given 30 days

prior to the end of each year. All taxes arising out of production (not including the real property taxes but specifically including the West Virginia gross sales tax) were payable by the contractors. Real property taxes and royalties were paid by the sublessors.

The coal sales agreements, entered into at approximately the same time as the sublease agreements and in conjunction therewith, provided that the contractors' entire production under the sublease agreements was to be sold to and purchased by Maust. Minimum monthly volumes of from 200 to 400 tons were required to be delivered and accepted. Each agreement specified a price to be paid for the coal and provided that if the general market price changed substantially, such price was to be increased or decreased by a comparable ratio as mutually agreed upon by the parties. Failure to so agree allowed either party to terminate the agreement on 30 days' notice.

Any termination of a sublease agreement automatically terminated the corresponding sales agreement, but termination of the sales agreement did not terminate the corresponding sublease agreement.

While carrying out the terms of the agreements, the contractors incurred substantial expenses in both preparation and mining costs. Though not so provided by the agreements, the sublessors told the contractors where to mine, but the cost of unsuccessful attempts to find coal was borne wholly by the contractors. Since substantially all coal produced was sold to Maust, no royalties as such were paid, however, each of the contractors did pay 50 cents per ton for the relatively small amounts of coal used by its employees.

Respondent's position is that petitioners have not shown that these agreements conveyed an economic interest in the coal in place to the contractors. He first argues that the contractors' rights, under the agreements described above, are meaningless to show that the contractors had any rights because there is insufficient evidence to show that the sublessors ever had an interest in the coal mined by the contractors which they could convey to the contractors. Apparently, in addition to the above agreements, he would require documentary evidence showing the sublessors' rights in the property mined.

We find and hold that the sublessors did have the right to extract all coal on the respective properties. The subleases themselves, by granting the contractors the right to extract the coal, are strong evidence that the sublessors could and did convey what the subleases purported to convey. In addition the treasurer of Cherry River Coal & Coke Co. and other Maust Coal subsidiaries gave undisputed testimony that the sublessors had the right to remove all coal in question. The above evidence is ample to establish, prima facie, the right of the sublessors to convey the rights enumerated. The burden to go forward with contrary evidence was then upon respondent. No evidence was introduced incon-

sistent with a valid conveyance and in the absence thereof we have found and hold for petitioners on this point.

Respondent next contends that even if the sublessors did transfer certain rights to the contractors, they did not convey the requisite "economic interest" in coal in place to them. At best, he argues, the contractors received no more than a "mere economic or pecuniary advantage from production." We agree with respondent on this point, since we find that petitioners have failed to show that the contractors "acquired by investment any interest in coal in place."

Petitioners do not contend that the contractors made any direct payments to the sublessors for the privilege of mining the coal subject to the subleases. Their position is that by expending large amounts of time and incurring large expenditures of risk capital in connection with the sublease agreements, the contractors indirectly acquired an interest in coal in place.

This argument has previously been presented to and rejected by the Supreme Court in *Paragon Coal Co.* v. *Commissioner*, 380 U.S. 624 (1965). In *Paragon* the taxpayers claiming depletion were drift miners,[3] as were the contractors in the instant case, mining coal under subleases from the Paragon Jewel Coal Co. In an attempt to show that they had acquired an interest in the coal in place, the miners showed that they had made a large investment of time, and in equipment, connecting roadways, buildings, the cost of opening the mines, and (in some cases) in the cost of installing track inside the mines to remove coal. But, as in the instant case, they had paid nothing for the privilege of mining the coal, acquired no title to the coal in place, and were not required to nor did they pay any royalty or land taxes required by Paragon's leases with the land owners.

In rejecting petitioners' contention that their expenditures created an interest in coal in place, the Court pointed out that none of the miner's expenditures represented a capital investment in the coal, but were all either deductible or recoverable through depreciation. Citing its opinion in *Parsons* v. *Smith*, 359 U.S. 215 (1959), which had rejected this type of investment as a means of obtaining an economic interest, the Court held that the miners had not obtained by investment an interest in coal in place, and for this reason, among others, were not entitled to the depletion deduction.

The expenditures which the contractors incurred in the instant case were of the same type and for a similar method of mining as those in

---

[3] Drift mining was defined as follows (p. 629) :

"'6 Drift mining is an underground mining operation in which a horizontal coal seam is reached by clearing away a part of the mountainside with a bulldozer. Two openings are made into the coal seam. One is an entry and the other is an air course used to ventilate the mine. Coal is removed as the drift mine is driven into the mountain following the seam of coal."

*Paragon Coal Co., supra.* We thus find and hold that for the same reasons as expressed in *Paragon,* the contractors' expenditures did not give them an interest in the coal in place. Cf. also *Lesta Ramey,* 47 T.C. 363 (1967), affd. 398 F. 2d 478 (C.A. 6, 1968).

We recognize that in *Charles P. Mullins,* 48 T.C. 571 (1967), we did find that a miner could obtain an economic interest in coal in place without making a direct payment for the privilege of mining. In that case a partnership had the obligation to mine a seam for a 2-year period or until it was no longer profitable, whichever occurred first, and in addition was required to make a royalty payment on each ton of coal mined. Under such circumstances we found that the partnership had made an investment sufficient to give the partnership the requisite economic interest.

In the instant case, under the various agreements, the contractors had the obligation to mine the lease areas to exhaustion or for 1-year renewable periods. However, the agreements do not provide for a royalty payment on coal sold to the sublessors, and with the exception of small amounts paid for employee coal, all coal mined was sold to the sublessors. There was some inconclusive, self-serving testimony by the contractors to the effect that they thought the "market" price paid to them on the coal they sold had been discounted, but they were unable to state what the discount was, if any. In the absence of any other evidence supporting this testimony, we are unable to find that there was any such discount and now hold that there was none. The coal sales agreements did call for a royalty payment from the contractors if they sold coal to others than the sublessors, but except for the *de minimis* amounts of coal used by petitioners' employees, that contingency did not occur during the years in issue.

Consequently, during the years in issue, the contractors had no more investment than the right and obligation to mine the respective areas to exhaustion. This, by itself, is insufficient to support a finding that it carried with it any economic interest in coal in place. As the Supreme Court stated in *Paragon Coal Co., supra* at 634–635:

In *Parsons* the contract was expressly terminable on short notice; here no specific right to terminate was mentioned in the agreement between the parties. However, as the Court of Appeals noted, "the contracts did not fix upon the operators an *obligation* to mine to exhaustion." In fact, many of them quit at any time they chose. We are unable to say that it is any more inequitable to allow Paragon to terminate the contracts at will than it is to allow the contractors to terminate work and thereby impose upon Paragon the obligation to get other people to work the mine or forfeit its right under the leases.

In any event, the right to mine even to exhaustion, without more, does not constitute an economic interest under *Parsons,* but is "a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit." *Helvering* v. *Bankline Oil Co.,* 303 U.S. 362, 367 (1938).

We thus find and hold that the contractors in the instant case had no more than a mere economic or pecuniary advantage derived from production and as such, during the years in issue, did not possess an economic interest in coal in place entitling them to percentage depletion.

## Supply Expense Issue

The question on this issue is one of fact. In 1962, Adkins Bros. Coal Co. expended $7,550 on certain mining equipment which had a useful life of 4 to 5 years. Section 1,612-2(a),[4] Income Tax Regs., provides that expenditures for such equipment generally must be capitalized and depreciated over its useful life. But expenditures necessary to maintain a mine's normal output made necessary by the recession of the working face thereof which—

(1) Do not increase the value of the mine, or
(2) Do not decrease the cost of production of mineral units, or
(3) Do not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made * * *

are deductible as ordinary and necessary business expenses.

Our findings of fact are dispositive of this issue. Leland Adkins' (president of Adkins Bros. Coal Co.) testimony established that the expenditures in issue satisfied the above requirements. His testimony was consistent, honest, unshaken by cross-examination, and we believed him. In addition, production figures from the mine in which the equipment was used confirmed Leland's testimony that total yearly production was not increased because of the equipment. Respondent points out that on a daily basis the mines produced an average of 374 tons daily after the equipment was installed, as opposed to 351 tons prior to that time, as coal was mined on fewer days in 1963 than in 1962. However, the difference of 23 tons is a relatively minor variation and does not necessarily indicate more efficient production. There is no other evidence in the record inconsistent with Leland's testimony. Since coal was being mined, the mine's face obviously must have been receding, and it seems reasonable that additional equipment was needed to maintain production.

---

[4] Sec. 1.612-2(a) reads in full as follows:

Sec. 1.612-2  Allowable capital additions in case of mines.

(a) *In general.* Expenditures for improvements and for replacements, not including expenditures for ordinary and necessary maintenance and repairs, shall ordinarily be charged to capital account recoverable through depreciation deductions. Expenditures for equipment (including its installation and housing) and for replacements thereof, which are necessary to maintain the normal output solely because of the recession of the working faces of the mine and which—

(1) Do not increase the value of the mine, or
(2) Do not decrease the cost of production of mineral units, or
(3) Do not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made shall be deducted as ordinary and necessary business expenses.

We therefore hold that petitioners have met their burden of proof on this issue and hold that the $7,550 amount was deductible under section 1.612–2, Income Tax Regs. Cf. *Roundup Coal Mining Co.*, 20 T.C. 388 (1953).

> *Decisions will be entered under Rule 50 in docket Nos. 691–66, 692–66, 828–66, and 833–66.*
> *Decisions will be entered for respondent in docket Nos. 2829–66 and 2830–66.*