Florence Costantino v. Commissioner.
Costantino v. Commissioner
Docket No. 740-68.
United States Tax Court
T.C. Memo 1970-43; 1970 Tax Ct. Memo LEXIS 317; 29 T.C.M. (CCH) 189; T.C.M. (RIA) 70043; February 17, 1970, filed. Robert G. MacAlister, Frank E. Coho and William C. McClure, 3320Grant Bldg., Pittsburgh, Pa. for the petitioner. Louis A. Boxleitner, for the respondent. 190 DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the years 1962 and 1963 in the amounts of $15,939.55 and $16,448.13, respectively. Although a deficiency was not determined by respondent for the year 1961, it is necessary for us to determine the amount of depletion deduction allowable to the petitioner in such year in order to determine the amount of net operating loss carryback from *318 1964 available for use in 1962. Respondent determined that the depletion deduction in the amount of $21,759.55 claimed by petitioner in 1961 was not allowable to the extent of $15,667.44. The only issue for decision is whether the petitioner had an economic interest in coal deposits, which she strip-mined under an agreement with the owner-lessee, so that she is entitled to deductions for percentage depletion under section 611, Internal Revenue Code of 1954. [1]
Findings of Fact Some of the facts have been stipulated and are found accordingly. Florence Costantino (herein called petitioner) is an individual who resided in Windber, Pennsylvania, at the time she filed her petition in this proceeding. For the calendar years 1961, 1962 and 1963 petitioner filed her Federal income tax returns with the district director of internal revenue at Pittsburgh, Pennsylvania. During the years in question petitioner engaged in the strip-mining of coal under the name of Costantino Coal Company. Petitioner's brother, Don Batiste, was the superintendent in charge *319 of the operations. Reitz Coal Company, a Pennsylvania corporation, was the owner or the lessee of various coal properties and was engaged in the production and sale of coal. As lessee, Reitz was entitled to sublease its rights and privileges. On November 1, 1954, petitioner and Reitz Coal Company entered into an agreement regarding the coal properties owned or leased by Reitz in Shade Township, Somerset County, Pennsylvania. The contract provided that "[whereas], Reitz desires to have strip-mining done" and "[whereas], the said Costantino has available the equipment and labor which would be required therefor," the parties agreed in part as follows: (3) Costantino agrees to strip-mine all of the "B" Seam of coal as shown on the attached print and shall transport the same to a bin or loading platform either along the Pennsylvania Railroad siding or at the tipple of Reitz No. 4 Mine. * * * (10) Reitz shall pay Costantino the sum of Two Dollars and sixty cents ($2.60) for each and every net ton of coal mined and removed from the aforesaid premises and delivered to the bin at Reitz No. 4 tipple or upon railroad cars along the Pennsylvania Railroad siding at said mine. * * * *320 (12) This agreement may be cancelled by either of the parties hereto, giving to the other one (1) month's notice in advance. They further agreed that (1) Reitz would make all payments to the Welfare Fund of the United Mine Workers; (2) Reitz would provide easements and rights of way in order that Constantino might have access to the coal; (3) Reitz assumed liability for claims arising out of injury to the surface or to water courses; and (4) Reitz Engineering Department should do the surveying and should supervise all strip-mining and back-filling. Costantino agreed to provide equipment adequate to remove up to 60 feet of overburden, maintain roadways, supply labor, and pay insurance under Workmen's Compensation laws. "Adjustments" in the agreement could be made at the end of any 30-day period. The contract contained no expiration date. The 1954 agreement referred to B seam coal. In 1961 about 45 percent of petitioner's production was from C Prime seams. In 1962 and 1963 petitioner stripped mostly C Prime coal. Although B seam coal differs from C Prime coal in ash and sulphur content, both seams are stripped in essentially the same manner. While the 1954 agreement required *321 petitioner to remove as much as 60 feet of overburden, in the years 1961 through 1963 petitioner at times removed 80 or 90 feet of overburden in order to reach the coal. 191 By 1961 Reitz Coal Company was considering discountinuing its operations. Because many employees were close to qualifying for retirement or disability, Reitz determined to continue operating so long as it could avoid substantial cash losses from operations. The relationship between Reitz and petitioner, as with other strippers, was intended to be flexible, so that either Reitz or petitioner could terminate the arrangement if it became unprofitable. The Costantino Coal Company was noted for the quality of its stripping operations. For years it had been the practice of Costantino to go beyond minimal statutory requirements for back-filling and surface restoration. Consequently, Reitz contemplated continuing its relationship with Costantino so long as operations were not unprofitable. During the years in question petitioner delivered all of the coal which had been mined to Reitz at the tipple of Reitz No. 4 Mine, as follows: *10 Tons Delivered
1961
1962
1963
January
2,825
10,934
19,626
February
7,566
10,662
9,463
March
7,794 10,151
11,080
April
5,187
5,285
5,230
May
6,667
1,913
6,311
June
13,735
12,953
10,864
July
4,815
3,820
3,3 00
August
7,784
10,955
7,292
September
5,694
6,873
6,100
October
7,642
11,863
8,936
November
10,847
9,890
4,875
December
16,955
14,124
4,197
*322 All of the coal delivered by petitioner to Reitz in the months of February through December of 1961, and in the years 1962 and 1963, was mined by petitioner from land owned by Reitz or from which Reitz as lessee had the right to remove the coal. Reitz paid petitioner various prices for the coal produced: Period
Price Per Ton
January 1961 - May 1961
$3.25
June 1961
3.15
July 1961 - November 1962
3.25
December 1962 - June 1963
3.15
July 1963 - October 1963
3.40
November 1963 (by tract):
Hamer
3.75
Thompson
3.75
Wilmore
3.40
Cook
3.00
December (Cook tract)
3.00
After delivery to the Reitz tipple, petitioner's coal was commingled with coal which had been delivered by other miners. Petitioner received a monthly statement from Reitz which showed the total tonnages of coal delivered to Reitz in a given month by all persons delivering coal to Reitz. This monthly statement also reflected the portion of the total tonnage which was delivered by petitioner, the tracts of land owned or leased by Reitz from which petitioner had mined the coal, the number of tons mined and delivered by petitioner from each tract, and the amount paid petitioner by Reitz *323 for each ton of coal delivered. The monthly statements reflected the net amount due petitioner from Reitz for coal delivered in the immediately preceding month, after taking into account the petitioner's pro rata share of rejects of all coal delivered to Reitz. The average price per ton for coal sold by Reitz during these years was: 1961
1962
1963
January
$5.7863
$5.4319
$ 5.4922
February
5.6183
5.5948
5.3305
March
5.3804
5.2301
5.0837
April
5.6190
4.9814
5.074
May
5.3333
5.1067
5.04 1
June
4.8831
4.9581
4.804
July
5.4858
4.8516
4.702
August
5.5555
5.1037
4.917
September
5.5764
5.2258
4.960
October
5.5876
5.3081
5.364
November
5.6101
5.4254
5.273
December
5.7691
5.2937
5.405
Petitioner was entitled to be paid and was paid for coal delivered by petitioner to Reitz even though Reitz had large quantities of coal on hand which Reitz had difficulty selling. Petitioner's right to payment for coal delivered to Reitz did not depend upon Reitz being able to sell the coal. Petitioner had no knowledge of the price received by Reitz from the sale of coal the petitioner mined. Petitioner had no responsibility for finding *324 buyers for the coal it mined for Reitz. The customary royalty paid for stripmining rights in the 1961-1963 period varied from 25 to 40 cents per ton. In this period the United Mine Workers were entitled to a 40-cent-per-ton payment to their welfare fund. Customarily the 40 cents was paid by the stripper. During the 1961-1963 period Reitz made the 40-cent-per-ton payment to the United Mine Workers. Petitioner did not pay directly any royalty to Reitz. Since Reitz bore these costs, petitioner received less money for the coal delivered to Reitz than she might have received if she had borne such costs. In its own financial records Reitz treated the payments made to petitioner in 1961, 1962 and 1963 as an item of cost of mine labor under the caption "Open Pit Mining." 192 In doing so, Reitz treated the payments to petitioner as a part of the cost of its raw product. Reitz also treated the payments made to the Welfare Fund of the United Mine Workers in connection with the coal mined by petitioner as part of its Mine Labor cost. Reitz paid the royalties required to be paid on the coal mined by petitioner from coal lands of which Reitz was the lessee. Reitz treated the royalty *325 payments as an expense in its financial records. Petitioner did not pay any royalties or real property taxes with respect to the coal deposits mined by her in 1961, 1962 and 1963. The strip-mining done by petitioner in 1961, 1962 and 1963 was in all respects performed in accordance with the terms of the 1954 agreement. As required by that contract, petitioner supplied all equipment and labor for the strip-mining and delivery of the coal mined for Reitz, delivered all of the coal to Reitz and performed its stripmining under the supervision of the Engineering Department of Reitz. Payments for coal mined and delivered were also made as provided in such agreement. The only deviations from the 1954 agreement in 1961, 1962 and 1963 were the coal lands mined by petitioner for Reitz and the amount paid petitioner for each ton of coal mined and delivered, both of which deviations were contemplated by the agreement. Reitz was in a bad financial condition in 1961 and 1962 and lost substantial sums of money from its operations in those years. BerwinWhite Coal Mining Company owned an interest in Reitz. Because of these losses, Robert H. Seese, the manager of Berwin White, was sent to Windber, *326 Pennsylvania, to close the Reitz operation. Seese made an effort to continue the operations of Reitz. By reason of Reitz's bad financial situation, all arrangements for its continued operation, including the strip-mining of coal by petitioner, were put on a day-to-day basis. At any given time Reitz could not be certain whether it could continue operations in the following month. Reitz's right to terminate its coal mining contract with petitioner on one month's notice was not dependent on Reitz's financial condition or any other condition. If, during the years 1961, 1962 and 1963, Reitz got into the position where it was no longer economically desirable to continue its operations, Reitz could have terminated its contract with petitioner by giving such notice. By 1964 the quality of coal mined by petitioner's operations had declined so that Reitz would not accept it. At petitioner's request, petitioner and Reitz on March 1, 1965, extended the 1954 agreement to provide for the strip-mining of coal by petitioner from certain identified coal land in Shade Township. The revised arrangement reflected some departures from the terms of the original agreement entered into in 1954. On March 1, 1965, Reitz *327 sent petitioner the following letter: As per your request, the Agreement of contract between this Company and yourself dated November 1, 1954, is hereby extended to permit you to strip mine the C Prime coal in 9.4 Acres, more or less, of Annie Berkebile Tract No. 923. In the event the quality of this C Prime coal is not acceptable to Reitz Coal Company, you are hereby authorized to sell the coal so mined to purchasers of your choice. You will pay to the Reitz Coal Company, as royalty, the sum of twenty-five cents (25") for each and every net ton (2,000 pounds) of C Prime coal mined and removed from the premises. You will obtain all water and stripmine permits as may be necessary or required. All other terms and conditions of the said Agreement of November 1, 1954, shall remain in full force and effect. This letter was signed by representatives of both parties and witnessed. In accordance with this letter, petitioner continued stripping, paying a royalty of 25 cents per ton to Reitz, and selling the coal elsewhere. With respect to the coal to be strip-mined by petitioner during the years 1961, 1962 and 1963, petitioner was not required to mine to exhaustion. Petitioner *328 was expected to mine only the coal which was practicable to mine with the equipment she had. Petitioner utilized power shovels, bulldozers and trucks in the strip-mining of coal for Reitz in the years 1961, 1962 and 1963. Almost all of petitioner's cost for these items of equipment had been recovered through allowances for depreciation prior to the year 1961. Much of the equipment was old by 1961. Petitioner claimed and was allowed deductions for all expenses incurred by her in the strip-mining of coal during the years in issue. Petitioner was not a lessee or sublessee of Reitz, which was the owner or lessee of the 193 coal deposits mined by petitioner in 1961, 1962 and 1963. In January, February and March of 1961 petitioner received payment for 19,458 tons of coal from a tract of coal land known as the Piney Run tract. The owner of that tract was Richland Township Water Company. Petitioner had a lease from that landowner and paid a royalty to that landowner. Respondent allowed petitioner a deduction for depletion with respect to the coal mined by petitioner from the Piney Run tract. The production from that tract and the depletion allowance with respect thereto are not *329 involved in this case. In 1961 and 1962 Reitz operated at a deficit, and thus could not claim an allowance for percentage depletion because of the limit of 50 percent of net income. In 1963 Reitz showed a surplus, but did not claim an allowance for percentage depletion. In his notice of deficiency respondent disallowed petitioner's claimed deductions for percentage depletion with the explanation that under the provisions of section 611 and 613 of the Internal Revenue Code the petitioner had no economic interest in the coal deposits in question. Ultimate Findings of Fact 1. The November 1, 1954, agreement between petitioner and Reitz Coal Company was in full force and effect during the years 1961, 1962 and 1963, and all strip-mining by petitioner for Reitz during such years was done in accordance with the terms and conditions of that agreement. 2. Petitioner did not share in the coal mined from the mineral deposits controlled by Reitz or in the income from such production. 3. Petitioner had no capital investment in the coal deposits mined by her. Her entire investment was only in equipment which was recoverable through deductions for depreciation. Opinion Section 611 *330 provides that "there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion." Section 613 provides that in the case of coal the depletion allowance shall be 10 percent of the gross income from the property, less royalties paid, not to exceed 50 percent of taxable income from the property. Only a taxpayer with an "economic interest" in the mineral deposit may claim the depletion allowance. Palmer v. Bender, 287 U.S. 551 (1933); section 1.611-1(b)(1), Income Tax Regs. What amounts to an "economic interest" has been the subject of considerable litigation. Although the perimeters of such term are by no means clear, two decisions by the Supreme Court of the United States concerning coal mining offer an indication of what is not an "economic interest." In Parsons v. Smith, 359 U.S. 215 (1959), and again in Paragon Jewel Coal Company v. Commissioner, 380 U.S. 624 (1965), the Supreme Court listed the following seven factors "to be considered in determining whether the coal-mining contracts there involved gave the contract miners any capital investment or economic interest in the coal in place": (1) that *331 [the contract miners] investments were in their equipment, all of which was movable - not in the coal in place; (2) that their investments in equipment were recoverable through depreciation - not depletion; (3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to [the contract miners] any capital interest in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that [the contract miners] could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that [the contract miners] were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered * * *; and (7) that [the contract miners], thus, agreed to look only to the landowners for all sums to become due them under their contracts. Contrary to petitioner's assertion, it is clear from the evidence contained in this record that petitioner was not a lessee or sublessee of Reitz Coal Company with respect to the coal properties strip-mined *332 by her during the years in question. We have therefore rejected petitioner's requested findings of fact in this respect. Petitioner contends that the November 1, 1954, agreement did not govern her relationship with Reitz Coal Company. She claims that she engaged in her strip-mining operations for Reitz in the years 1961 through 1963 under "oral" leases or agreements. Respondent, on the other hand, takes the position that the relationship between petitioner and Reitz during such years was 194 controlled by the terms and conditions of the 1954 agreement. Notwithstanding the concerted efforts of petitioner to ignore or circumvent the provisions of the 1954 agreement, we are persuaded that the parties adhered to its terms and conditions from 1961 through 1963. Even the testimony of petitioner's own witnesses supports this conclusion. Nor are we persuaded by petitioner's point that there was a significant difference between strip-mining B seam coal and C Prime coal. The attempted distinction has no substance. Furthermore, there is no evidence in this record showing that the agreement was ever abrogated by the parties. Indeed, by the amendatory letter agreement of March 1, 1965, they *333 explicitly "extended" the 1954 contract at petitioner's request in order to permit her to mine certain coal which she would be free to sell to anyone, if Reitz did not want it, and for which she would pay a royalty. The 1965 amendment concluded with the recital: "All other terms and conditions of the said Agreement of November 1, 1954 shall remain in full force and effect." We think this language, coupled with the recital in the opening paragraph of the 1965 letter that "the Agreement of contract between this Company [Reitz] and yourself dated November 1, 1954, is hereby extended," can only mean that the parties recognized at all times between November 1, 1954, and some point of time beyond March 1, 1965, that the 1954 agreement was in force and effect, and fully operative as to the coal strip-mined by petitioner for Reitz during the years 1961 through 1963. The conduct of the parties during these years further buttresses our conclusion. From 1961 through 1963 both Reitz and the petitioner abided by the 1954 agreement. Petitioner mined the coal where Reitz told her to mine and delivered all of it to Reitz at the place Reitz told her to deliver it. She furnished all of the equipment *334 and labor to mine the coal. She performed her work under the supervision of the Engineering Department of Reitz and back-filled open cuts and pits as directed by that Department. When she mined a ton of coal, she knew the amount she would be paid for it. When she delivered that ton of coal, her fixed sum was earned and paid, and she had no further control over the coal or responsibility for its disposition. See Paragon Jewel Coal Company v. Commissioner, supra at 628. She was paid by a designated date each month for all coal mined and delivered in the preceding month. In short, what petitioner did for Reitz and what Reitz did for her in 1961, 1962 and 1963 was in strict conformity with the 1954 agreement. In her brief the petitioner has made repeated references to the existence of alleged "first refusal" purchase agreements between herself and Reitz. To have a purchase of coal by Reitz, the petitioner would at some point of time have had to obtain some ownership interest in the coal in place. Reitz could not "purchase" coal from petitioner and petitioner could not "sell" coal to Reitz unless petitioner owned the coal. The record herein fails to establish that Reitz ever *335 conveyed to petitioner an ownership interest in the coal which she mined during the years in issue. When Reitz and petitioner decided on March 1, 1965, to enter into a "first refusal" purchase agreement they did so with little difficulty and formality. They amended the 1954 agreement and provided for the payment of a 25 cent per ton royalty to Reitz on coal which was refused by Reitz. Prior to the amendatory letter agreement of March 1, 1965, the petitioner did not pay any royalties on coal deposits strip-mined by her. Acknowledging that the case law is against her, petitioner urges us to treat her investment in equipment and her costs in removing the coal and back-filling as investments in the coal. This position is without merit. The Supreme Court and this Court have held that such expenditures, for which a miner gets deductions through depreciation or otherwise, do not represent a capital investment in the coal and do not give the miner an economic interest in the coal in place. Paragon Jewel Coal Company v. Commissioner, supra; Leland Adkins, 51 T.C. 957, 967 (1969). In applying the seven factors of parsons and Paragon to the instant case, we find: *336 1. Petitioner's investment was entirely in equipment, merely all of which was movable. 2. Petitioner's investment in equipment was recoverable through depreciation allowances and had, in fact, been largely recovered by 1961, the first year involved in this proceeding. 3. The 1954 agreement between petitioner and Reitz, which governed petitioner's stripmining operations in the taxable years, was terminable on one month's notice by either 195 petitioner or Reitz, without any reason being required for termination. See Charles P. Mullins, 48 T.C. 571 (1967). 4. All rights to mine coal from coal lands in Shade Township, Somerset County, Pennsylvania, were vested in Reitz, either as owner or lessee. There is no evidence in this case that Reitz ever agreed to surrender or did surrender to petitioner any interest in the coal which only it had the right to mine or have mined. 5. All coal mined by petitioner in the years 1961 through 1963 was delivered to Reitz. 6. Petitioner received a fixed sum for all coal mined and delivered to Reitz, which sum remained undisturbed for long periods of time even though the price which Reitz received fluctuated widely. For example, *337 the price which Reitz received on the sale of coal mined by petitioner was sold for amounts as high as $5.78 a ton and as low as $4.70 a ton. By comparison the amount received by petitioner was in the $3.15-$3.75 range. See William M. Legg, 39 T.C. 30, 40 (1962). Petitioner did not share in the proceeds received by Reitz from the sale of the coal. 7. Petitioner looked only to Reitz for payment for coal mined and delivered to Reitz and was paid whether or not Reitz had a buyer for the coal. The inexorable conclusion to be drawn from these facts is that the petitioner herein does not differ in any significant respect from the contract miners in Parsons or Paragon. Petitioner has not shown that she was the owner of an economic interest in coal in place during the taxable years 1961, 1962 and 1963. Accordingly, we hold that she is not entitled to any deductions for percentage depletion in those years other than the amount previously allowed by respondent for the year 1961. Decision will be entered for the respondent. Footnotes
1. All subsequent statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩